Ryan B. Abbott (5053673)
 ryan@bnsklaw.com
Rowennakete P. Barnes (5528955)
 kete@bnsklaw.com
**BROWN NERI SMITH & KHAN, LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Plaintiff/Counterclaim-Defendant,*
The ProImmune Company, LLC

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PROIMMUNE COMPANY, LLC, a Delaware limited liability company;<br><br>          Plaintiff,<br>v.<br><br>HOLISTA COLLTECH LTD., an Australian corporation; and DOES 1-50, inclusive;<br><br>          Defendants. | Case No.: 7:20-cv-01247-KMK |

### DECLARATION OF ALBERT CRUM M.D. IN SUPPORT OF

### PLAINTIFF/COUNTERCLAIM-DEFENDANT THE PROIMMUNE COMPANY, LLC'S

### <u>MOTION FOR SUMMARY JUDGMENT</u>

### (PART 1 OF 2)

1

I, Albert Crum, M.D., declare:

1.　　　I am the principal of Plaintiff/Counterclaim-Defendant The ProImmune Company, LLC ("ProImmune") and was at all times relevant to this lawsuit, and make this declaration in support of its motion for summary judgment. I have personal knowledge of the facts set forth below, and if called to testify, I could and would competently testify thereto.

2.　　　Attached as **Exhibit A** is a true and correct copy of the first distribution agreement ("Contract No. 1") that was entered into between ProImmune and Defendant/Counterclaim-Plaintiff Holista Colltech Ltd. ("Holista") on March 16, 2015.

3.　　　Attached as **Exhibit B** is a true and correct copy of the second distribution agreement ("Contract No. 2) that was entered into between ProImmune and Holista on June 2, 2016.

4.　　　Attached as **Exhibit C** is a true and correct copy of the fourth distribution agreement ("Contract No. 4, and together with Contract No. 1 and No. 2, the "Contracts") that was entered into between ProImmune and Holista on September 1, 2018.

5.　　　The Contracts appointed Holista as the exclusive distributor for ProImmune's product Immune Formulation 200® (the "Product") throughout certain countries in Asia. In being appointed exclusive distributor, Holista was required to make minimum purchase amounts of the Product under each Contract.

6.　　　Holista did not meet the minimum purchase requirements under the Contracts. I would constantly remind Holista of its obligation to meet the minimum purchase requirements, and never indicated that ProImmune was waiving that obligation in any of the Contracts.

7.　　　Although ProImmune entered into Contract No. 2 and Contract No. 4 when Holista had outstanding minimum purchase requirements that it was not compliant with,

ProImmune and Holista agreed that those minimum purchases would be brought into compliance and were not waived.

8.     When Holista and ProImmune would negotiate and enter into a subsequent Contract, I always indicated to Holista that ProImmune was not waiving compliance with the past due minimum purchase requirements.

9.     Attached as **Exhibit D**, are true and correct copies of emails that I sent to Holista's CEO Dr. Rajen Dato ("Dr. Rajen") reminding him of Holista's obligation to meet minimum purchase requirements under the Contracts throughout the entire time of the parties' relationship.

10.     While ProImmune had various obligations under the Contracts, the main obligation was to supply Holista with Product that conformed to the various warranties and specifications indicated in each Contract. ProImmune was only required to produce the specified Product and make it available for pick up at the manufacturer, after which Holista was responsible for arranging for the shipping of the Product. ProImmune performed its obligations for the Contracts.

11.     Holista had complained before about issues regarding packaging, mesh size of the Product, and color and taste of the Product. While mesh size for the Product was incorporated into Contract No. 4, ProImmune had no contractual obligations as to Holista's other complaints. ProImmune never violated Contract No. 4 with regard to mesh size either.

12.     The Contracts also had provisions that gave Holista the right to inspect and reject Product within a specified time period. Holista never once inspected the Product or rejected it. Further, Holista never requested to return any Product or to be reimbursed for any Product, and ProImmune never consented to the return or reimbursement of any Product.

13.     The Parties' relationship began to break down around August 2019. Around that time, one of Holista's customers claimed that a batch of Product they ultimately received was significantly below the required percentage of amino acid content. The contested batch was Lot # 1015811. That lot was produced and made available for pick-up by Holista in November 2018. While this was shortly after Contract No. 4 was entered into, the orders were under a third distribution agreement between the Parties, and were purchase order numbers POM/18/09 and POM/18/10. Attached as **Exhibit E** is a true and correct copy of the email indicating when Lot # 1015811 was manufactured for Holista.

14.     Holista's customer did not raise an issue with Lot # 1015811 until nearly a year later around August 2019. Regardless, our manufacturer confirmed that the Product conformed to the required specifications, including by provide a certificate of analysis that demonstrated the product was compliant.

15.     Shortly before the Parties' relationship broke down, Holista made various payments totaling $311,850.00. ProImmune prepared the Product and informed Holista that the Product was available at the manufacturer for pick-up. Attached as **Exhibit F** is a true and correct copy of an email that I sent to Dr. Rajen informing him that Product was available for Holista to pick up. Holista never picked that Product up, and in order to avoid the Product expiring and going to waste, ProImmune sold that Product to a third party on or about March 6, 2020.

16.     ProImmune has been ready and willing to provide Holista with Product that it paid for, should Holista still desire to obtain the Product.

17.     Throughout the Parties' relationship, ProImmune switched manufacturers at certain times, and also switched primary ingredients based on Holista's requests. Under all

contracts, ProImmune rounded off the weights from the conversion from pounds to kilograms as 2.2lbs equaling one kilogram.

    a.   Under Contract No. 1:

        i.   Holista's minimum purchase requirement was 10,200 kg. Holista's purchase price was $40.50 per pound for the first 10,000 kg of product, and $54.00 per pound for the next 200 kg.

        ii.   Holista's purchase price was $89.10 per kg for the first 10,000 kg of product and $118.80 per kg for the next 200 kg, representing a total payment due to ProImmune of $914,760.00.

        iii.   ProImmune paid              to a third-party manufacturer to manufacture Product. For orders placed by Holista under this Contract, ProImmune used RFI Ingredients, LLC as its third-party manufacturer of Product. Holista would pick up Product directly from the manufacturer and pay for shipping. There were no other direct costs for ProImmune associated with manufacturing.

        iv.   Therefore, ProImmune expected a profit of            for the         .

        v.   ProImmune only charged Holista for 6,400 kg although it supplied 6,550 kg of Product to Holista. The Product ProImmune supplied to Holista without cost was not considered part of their minimum required purchase.

        vi.   Holista failed to purchase 3,800 kg of Product.

.

b.   Under Contract No. 2:

   i.   Holista's minimum purchase requirement was 12,000 kg. Holista's

         purchase price was $40.50 per pound. Of the 12,000 kg, Holista was

         required to purchase 2,000 kg in the first half of 2016, 5000 kg in the third

         quarter of 2016, and 5,000 kg in the fourth quarter of 2016.

   ii.  Holista's purchase price was thus $89.10 per kg, representing a total

         payment due to ProImmune of $1,069,200.00.

   iii. ProImmune paid                           to a third-party manufacturer to

         manufacture Product. For orders placed by Holista under this Contract,

         ProImmune used PNP Pharmaceuticals, Inc. of British Columbia, Canada,

         as its third-party manufacturer of Product. Holista would pick up Product

         directly from the manufacturer and pay for shipping. There were no other

         direct costs for ProImmune associated with manufacturing.

   iv.  The average cost for ProImmune to manufacture Product was


   v.   Therefore, ProImmune expected to make a profit of

         for the 12,000 kg of Product.

   vi.  ProImmune only charged Holista for 4,000 kg purchased at a price of

         $89.10 per kg, although it supplied 4,400 kg of Product to Holista. The

         Product ProImmune supplied to Holista without cost was not considered

         part of their minimum required purchase.

   vii. Holista failed to purchase 8,000 kg of Product. Thus, ProImmune's lost

         profit was 8,000 kg times            for a total shortfall of                    .

c.  Under Contract No. 4's Initial Period:

    i.  Holista's minimum purchase requirement was 12,000 kg. Holista's purchase price was $40.50 per pound. All purchases during the Initial Period were to be considered purchases made in 2018 for the purposes of Holista's minimum annual performance requirements.

    ii.  Holista's purchase price was $89.10 per kg, representing a total payment due to ProImmune of $1,069,200.00.

    iii.  ProImmune paid _____ to a third-party manufacturer to manufacture Product. For orders placed by Holista under this Contract, ProImmune used UST Corp. of Utah as its third-party manufacturer of Product. Holista would pick up Product directly from the manufacturer and pay for shipping. There were no other direct costs for ProImmune associated with manufacturing.

    iv.  ProImmune expected a profit of _____ for the 12,000 kg of Product.

    v.  Holista only purchased 3,500 kg at a price of $89.10 per kg.

    vi.  Holista failed to purchase 8,500 kg of Product. Thus, ProImmune's lost profit was 8,500 kg times _____ for a total shortfall of

d.  Subsequent to Contract No. 4's Initial Period:

    i.  ProImmune continues to treat Contract No. 4 as valid and on-going. As a result, Holista has also failed to meet its minimum annual performance entirely in every year since 2018. The minimum annual performance requirements are to purchase 12,000 kg for a calendar year.

      II.   Holista's purchase price was thus $89.10 per kg, representing a total payment due to ProImmune of $1,069,200.00 per year.

     III.   In 2019, Holista failed to purchase 12,000 kg of Product. Thus, ProImmune's lost profit was 12,000 kg times       for a total shortfall of       .

     IV.   In 2020, Holista failed to purchase 12,000 kg of Product. Thus, ProImmune's lost profit was 12,000 kg times       for a total shortfall of       .

     V.   In 2021, to date, Holista has failed to purchase any Product. Thus, as of June 1, 2021, ProImmune's lost profit was 5,000 kg (prorated for five months out of twelve) times       for a total shortfall of       .

     VI.   As Holista's minimum annual performance is ongoing, and Holista continues not to meet its requirements, ProImmune's damages are ongoing.

     VII.   In 2021, between the end for Contract No.4's Initial Period to June 1, 2021, ProImmune's lost profit has been       .

18. Thus, ProImmune lost       0 under Contract No. 1,       under Contract No. 2, and       0 during the Initial Period of Contract No. 4, for a total of       .

19. In addition, by Holista's continued failure to meet its minimum purchase requirements since the end of Contract #4's Initial Period, ProImmune lost a total of       as of June 1, 2021.

20. In sum, as of June 1, 2021, ProImmune has lost a total of $2,445,410.00.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on June  $\cancel{13}$ , 2021 at Rhinebeck, New York.

Albert Crum, M.D.

# EXHIBIT A

# DISTRIBUTION AGREEMENT

THIS AGREEMENT ("**Agreement**") is made and entered to this 16th day of March, 2015

**AMONG**

1. **THE PROIMMUNE COMPANY, L.L.C.**, a limited liability company formed under the laws of the State of Delaware, USA and having its principal place of business at 64 East Market Street, Rhinebeck, New York 12572 (hereinafter referred to as "**PROIMMUNE**");

2. **RFI, LLC**, a New York limited liability company with offices located at 300 Corporate Drive, Blauvelt, New York 10913 (hereinafter referred to as "**RFI**");

**AND**

3. **HOLISTA COLLTECH LTD.** (Corporate registration number ABN 24 094 515 992), a company incorporated under the laws of AUSTRALIA and having its registered address at at Level Level 4, 66 Kings Park Road, West Perth WA 6005 (hereinafter referred to as "**HOLISTA**").

**WHEREAS**

I. PROIMMUNE is the owner of the intellectual property identified in item 2 of Schedule 1.

II. RFI is the manufacturer of the Product (as defined in item 2 of Schedule 1).

III. HOLISTA is engaged in the sale and distribution of healthcare products and wishes to establish and develop sales of the Product as a dietary supplement in the Territory (as defined in item 5 of Schedule 1) and distribute the Product via various distribution channels including but not limited to QNet Multi Level Marketing; providedthat any distributor other than HOLISTA, including all multilevel marketers, shall only have non-exclusive distribution rights.

IV. Upon the terms and conditions of this Agreement, PROIMMUNE hereby appoints HOLISTA as its exclusive distributor of the Product, solely as a dietary supplement, within the Territory.





EXHIBIT
2

**CONFIDENTIAL**                                               PROIMMUNE_004195

NOW, THEREFORE, in consideration of the covenants, terms and conditions set forth herein, the parties agree as follows:

1.      DEFINITIONS.

1.1     In this Agreement and the Schedules, unless the context otherwise requires:

     1.1.1   **"Acceptance Requirement"**means the Product shall comply with the Certificate of Analysis (COA)  provided by RFI LLC, 697 N. Denver Ave Suite 132, Loveland, CO 80537;

     1.1.2   **"Commencement Date"**means, the date specified in item 1 of Schedule 1;

     1.1.3   **"Customers"** means clients purchasing the Product, or specifying or influencing the sale of the Product for resale to or purchase by end-users;

     1.1.4   **"Force Majeure"** means, any circumstances beyond the reasonable control of either Party including, without limitation, any act of God, epidemic, fires, floods, war or act of war (whether declared or undeclared), sabotage, accidents, insurrection, riot, strike, lock out or other form of industrial action or government intervention;

     1.1.5   **"Minimum Monthly Performance Requirements"** means the minimum monthly performance targets required to be satisfied by HOLISTA as specified in Schedule 3;

     1.1.6   **"Parties"** means, parties to this Agreement and **"Party"** means any of them;

     1.1.7   **"Payment Terms"** means, terms for payment by HOLISTA of the price payable for the Product as specified in item 3 of Schedule 1;

     1.1.8   **"Pick-Up Address"** means, RFI manufacturing facility, 2145 Alter Street, Dock#6Broomfield, CO 80020, FOB, or any other delivery address within the Territory that PROIMMUNE, RFI and HOLISTA may consent to  in writing from time to time;

     1.1.9   **"Pick-up Date"** means, the date stated as the delivery date in the delivery request for the Product to be delivered to the Pick-Up Address as required by HOLISTA and consented to by PROIMMUNE;

     1.1.10  **"Product"** means, the Product listed in item 2 of Schedule 1;

     1.1.11  **"Product Price"** means price for the Product as listed in item 6 of Schedule 1;

     1.1.12  **"Term"** means the period commencing from the Commencement Date and ending upon its termination and/or expiration in accordance with this Agreement; and



CONFIDENTIAL

1.1.13 **"Territory"** shall mean the country/countries and territory/territories specified in item 5 of Schedule 1.

1.2 The headings in this Agreement are inserted for convenience only and shall be ignored in construing the Agreement.

1.3 Any word or expression defined in this Agreement, shall unless the context otherwise requires, have the same meaning in the Schedules to this Agreement.

1.4 Unless the context otherwise requires, in this Agreement:

1.4.1 words using the singular number shall also include the plural number vice versa and words denoting any gender shall include all genders;

1.4.2 references to any "person" include any natural person, corporation, judicial entity, association, statutory body, partnership, limited liability company, joint venture, trust, estate, unincorporated organization or government, state or any political subdivision, instrumentality, agency or authority;

1.4.3 the words "include" or "including" shall be deemed to be followed by "without limitation" or "but not limited to" whether or not they are followed by such phrases or words of like import; and

1.4.4 references to any Party shall be construed as a reference to such Party's successors and permitted assigns.

1.5 Any references to **"Clauses"** and **"Schedules"** in this Agreement shall be construed as references to the clauses of and schedules to this Agreement.

2. APPOINTMENT OF DISTRIBUTOR

2.1 PROIMMUNE hereby appoints HOLISTA as its exclusive distributor for the distribution of the Product as a dietary supplement in the Territory and HOLISTA hereby agrees to act in that capacity, subject to the terms and conditions of this Agreement. For the avoidance of doubt, this right may not be transferred or delegated to any other Party by HOLISTA and HOLISTA may not nor may it permit any person to, engage in the manufacture of the Product.

2.2 PROIMMUNE agrees to do the following during the continuance of the Agreement:

2.2.1 not to appoint any other person, firm and/or company as PROIMMUNE distributor or agent for the Product in the Territory;

2.2.2 not to sell, supply or otherwise provide or deliver the Product to any other person, firm and/or company in the Territory for the purpose of resale; and

2.2.3 to only provide and supply the Product to any other person, firm and/or company in the Territory solely for the purpose of Research and Development.



2.3    HOLISTA agrees to do the following:

2.3.1    actively and diligently promote the sale of the Product in the Territory during the Term hereof;

2.3.2    use its best efforts to actively and diligently promote the sale of the Product in the Territory during the term thereof;

2.3.3    promote and/sell the Product in dosing protocols in strict compliance with the recommendations of PROIMMUNE;

2.3.4    provide PROIMMUNE with a monthly and quarterly statement of Customers and associated sales of the Product;

2.3.5    assume and discharge for its own account all cost and expenses necessary or incidental to its distribution of the Product (including but not limited to, packaging, advertising, taxes, licenses and permits) and shall indemnify PROIMMUNE against all costs, expenses, claims, promises, guarantees, debts, obligations and liabilities of any kind incurred, contracted for, or created by HOLISTA, which have not been specifically assumed in writing and in advance by PROIMMUNE;

2.3.6    keep PROIMMUNE advised of market conditions relative to potential and active business in the Territory and promptly transmit any product complaints or questions to PROIMMUNE;

2.3.7    participate in the distribution and maintenance of literature and communications to the Customers;

2.3.8    to the best of its ability, encourage the purchase of the Product by Customers and at all times represent the Product fairly;

2.3.9    refrain from engaging in any trade practices which may adversely affect the high image, credibility or reputation of PROIMMUNE or the Product, and not make any false, misleading or disparaging representations or statements with respect to PROIMMUNE or the Product; and

2.3.10    comply with all municipal, provincial and state regulations relating to the sale and distribution of the product in the Territory.

2.4    HOLISTA shall not:

2.4.1    place an order for or obtain the Product for resale from any person, firm and/or company other than PROIMMUNE;

2.4.2    solicit sales of the Product from, or specify delivery of the Product, to any Customer located outside of the Territory or which it knows, or should have known upon reasonable inquiry, is likely to sell the Product outside of the



CONFIDENTIAL

Territory, unless HOLISTA executes a separate written agreement with PROIMMUNE in relation to any such state or country; and

2.4.3 for purposes of maintaining exclusivity within the Territory, and respecting any exclusive rights of PROIMMUNE's other distributors, directly or indirectly, market, solicit sales of or sell, the Product via the internet, outside of the Territory.

2.5 HOLISTA agrees to develop a business plan and marketing plan for the Territory with sixty (60) days from the Commencement Date. Such business plan shall identify all potential Customers for the Product in the Territory, Customers existing product lines and estimated volumes, and assessment of revenue potential for the Product plus a strategic outline for each Customer detailing strategies to maintain and develop existing Customers and strategies for converting target Customers. PROIMMUNE shall have the right to approve such business plan.

2.6 RFI agrees to:

2.6.1 only fill orders placed by PROIMMUNE and shall not fill any orders placed directly by HOLISTA;

2.6.2 provide a Certificate of Analysis on each order placed by PROIMMUNE;

2.6.3 notify PROIMMUNE of any orders that once completed do meet the Acceptance requirement;

2.6.4 notify PROIMMUNE if it is unable to complete any order by the Pick-up Date for such order; and

2.6.5 notify PROIMMUNE if HOLISTA does not collect any order within seven (7) calendar days of the Pick-up Date for such order.

3. TERMS OF PURCHASE

3.1 HOLISTA hereby agrees to purchase 1,000 kilograms (the **"Initial Order"**), upon execution of this Agreement for an aggregate price of US$89,100.

3.2 US$44,550 (the **"Escrow Amount"**) shall be deposited by HOLISTA in the bank account identified on item 9 of Schedule 1 (the **"Escrow Account"**), on the Commencement Date; such Escrow Amount shall be released to PROIMMUNE upon delivery of the Initial Order to the Pick-Up Address.

3.3 An additional US$44,550 shall be deposited by HOLISTA to the Escrow Account upon delivery of the Initial Order to the Pick-Up Address and shall be released to PROIMMUNE upon collection of the Product from the Pick-Up Address by HOLISTA.

3.4 All additional orders shall be paid in accordance with the terms set forth in item 3 of Schedule 1 to the attention of the Escrow Agent.

DISTRIBUTION AGREEMENT BETWEEN HOLISTA COLLTECH LTD., RFI, LLC and PROIMMUNE
Page 5 of 21
US_102073900v9



3.5 Subject as provided in this Agreement, during the Term of this Agreement HOLISTA agrees to purchase from PROIMMUNE, for distribution within the Territory, not less than the minimum quantities of Product required in order to meet the Minimum Monthly Performance Requirements.

3.6 In the event that HOLISTA shall purchase more than the prescribed Minimum Monthly Performance Requirement for a particular month, the excess shall be credited towards the Minimum Monthly Performance Requirement in any subsequent month.

3.7 All orders of the Product made by HOLISTA to PROIMMUNE shall be in writing and delivered by fax or e-mail and receipt confirmed by PROIMMUNE. All verbal requests to purchase and/or to modify an existing order shall not be valid until followed up in writing.

3.8 Throughout the continuance of this Agreement PROIMMUNE shall deliver the Product to the Pick-Up Address, within the time stipulated by HOLISTA in the purchase order and agreed to by PROIMMUNE.

4. INSPECTION AND ACCEPTANCE OF PRODUCT

4.1 HOLISTA shall have the Product inspected within seven (7) calendar days from the Pick-up Date to the Pick-Up Address to ensure the Product meets the Acceptance Requirements. Any Product that does not comply with the Acceptance Requirements may be rejected by HOLISTA, in which case PROIMMUNE shall at its own cost and expense collect the Product so rejected at the Pick-Up Address. Any order not specifically rejected by HOLISTA or it designee at the Pick-Up Address shall be deemed accepted by HOLISTA as the end of such seven (7) calendar day period.

4.2 Risk in the Product shall pass to HOLISTA on acceptance of the Product at the Pick-Up Address by HOLISTA or its designee of the Product.

4.3 Title to the Product shall pass from PROIMMUNE to HOLISTA upon delivery of the Product by PROIMMUNE to the Pick-Up Address OR upon PROIMMUNE receiving full payment for the Product, whichever is the earlier.

5. PRICE AND PAYMENT TERMS

5.1 PROIMMUNE shall sell the Product to HOLISTA at the Product Price. The Product Price does not include federal, state and/or local taxes applicable to the Product sold under this Agreement. HOLISTA shall sell the Product to customers in the Territories at a price determined by HOLISTA plus any and all sales tax, goods and services tax, value added tax and/or any other tax of a similar nature payable in connection thereto.

5.2 All pricing and delivery of Product shall be in accordance to item 6 of Schedule 1 and supported by delivery receipts indicating product codes, quantities, batch numbers and, where applicable the expiry dates of the Product. Unless otherwise agreed by the parties in writing, HOLISTA shall be responsible for shipping costs from the Pick-Up Address, customs clearance of the Product upon arrival in each Territory and HOLISTA shall be

Initial: 

responsible for all clearance cost including any taxes and duties levied by the customs and excise authorities in each Territory for the importation of the Product, handling charges, freight and other costs in relation to delivery of the Product to the Territory.

5.3    HOLISTA shall pay the price specified in each invoice in accordance with the Payment Terms and all payments under this Agreement to PROIMMUNE shall be made in United States Dollars (USD) by wire transfer to the Escrow Account or any such means the Parties may hereafter agree.

5.4    In the event that PROIMMUNE is unable to deliver the first order of the Product within 90 days of the Initial Order, all payments made shall be fully refundable to HOLISTA.

6.    SALE OF PRODUCT

6.1    Subject as provided in this Agreement, HOLISTA shall be entitled to distribute the Product in the Territory in such manner and on such terms as HOLISTA thinks fit and that are agreed to by PROIMMUNE.

6.2    HOLISTA shall distribute the Product in any packaging and presentation and/or the original packaging and presentation agreed to by PROIMMUNE; provided that all packaging used by HOLISTA shall clearly exhibit the PROIMMUNE trademark and U.S. patent number on the Product. For the avoidance of doubt, the Product may not be distributed under a private label that does not include the PROIMMUNE trademark and U.S. patent number on the packaging.

7.    SUPPORT AND TRAINING

7.1    PROIMMUNE shall from time to time, at HOLISTA's expense, provide HOLISTA with reasonable assistance and co-operation as may be reasonably required by HOLISTA for the sale and/or distribution of the Product in the Territory.

7.2    PROIMMUNE shall endeavor to answer as soon as practicable any enquiries of HOLISTA concerning the Product.

7.3    [Reserved]

7.4    HOLISTA shall bear the cost of travel and accommodation of any personnel of PROIMMUNE for any promotional activities initiated by HOLISTA in the Territory.

8.    RETURNS POLICY

8.1    HOLISTA and PROIMMUNE shall mutually agree to the terms and conditions of PROIMMUNE returns policy and the reasons goods returned set forth on Schedule2 of this Agreement (hereinafter referred to as the **"Returns Policy"**) in respect of the Product.



PROIMMUNE_004201

8.2      HOLISTA shall be entitled to replacement or reimbursement of any Product returned by any customer in accordance with the Returns Policy from PROIMMUNE and PROIMMUNE shall replace all such returned Product at the Pick-Up Address.

8.3      HOLISTA shall not be entitled to any replacement or reimbursement of any Product returned by any customer outside the Returns Policy, unless HOLISTA has obtained prior written consent of PROIMMUNE to such return. PROIMMUNE shall accept all such returns PROIMMUNE consented to and shall replace the returned Product at HOLISTA's cost.

9.      WARRANTIES

9.1      PROIMMUNE represents and warrants to HOLISTA that:

     9.1.1      The Product supplied to HOLISTA under this Agreement:

         (i)      is not subject to any security interest, liens or other encumbrances;

         (ii)      is of satisfactory quality, free of residuals and contaminants, and fit in all respects or the purpose(s) for which the Product is intended to be used and shall comply with all and any specifications provided by PROIMMUNE for such Product; and

         (iii)      conforms to the ingredient of such Product as described on the label, package inserts and packaging.

     9.1.2      All literature and information supplied by PROIMMUNE in relation to the Product are true, complete and accurate in every respect.

     9.1.3      PROIMMUNE has not withheld or omitted to disclose to HOLISTA any material information relating to the Product.

9.2      Each Party hereby represents and warrants to and undertakes with the other Party as follows:

     9.2.1      it is a duly organized corporation or limited liability company, as the case may be, validly existing under the laws of its place of incorporation, and has full power and authority to execute, deliver and perform all of its obligations under this Agreement and any other agreements to be executed by it hereunder;

     9.2.2      it has taken all actions, complied with all conditions required, fulfilled and obtained all the necessary consents to enable it to do the following:

         (i)      lawfully enter into, exercise its rights and comply with its obligations under this Agreement; and

         (ii)      to ensure that those obligations are legally binding and enforceable AND have been taken and fulfilled.

    

## PROOF OF SERVICE

I am a resident of the State of New York, over the age of eighteen years, and not a party to the within action.  My business address is: Brown, Neri Smith & Khan LLP, 11601 Wilshire Blvd., Suite 2080, Los Angeles, CA 90025.  On the date below, I served the document(s) as follows:

- **DECLARATION OF STEPHEN G. CHADWICK IN SUPPORT OF PLAINTIFF/COUNTERCLAIM-DEFENDANT THE PROIMMUNE COMPANY, LLC'S MOTION FOR SUMMARY JUDGMENT**

⊠      **BY ELECTRONIC MAIL:** I caused such document(s) to be electronically mailed

in PDF format as an e-mail attachment to each addressee for the above-entitled case.  The transmission was complete and confirmed.  A copy of the transmittal e-mail will be maintained with the original document(s) in our office.

To the addresses on the following address:

Natraj S. Bhushan, Esq.
Turturro Law P.C.
1602 McDonald Ave.
Brooklyn, NY 11230
E: natraj@turturrolawpc.com

Attorneys for Defendant/Counterclaim Plaintiff,
Holista Colltech, Ltd.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.  Executed on June 14, 2021, at Albany, NY.

_____
Rowennakete P. Barnes