Ryan B. Abbott (5053673)
 ryan@bnsklaw.com
Rowennakete P. Barnes (5528955)
 kete@bnsklaw.com
**BROWN NERI SMITH & KHAN, LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Plaintiff/Counterclaim-Defendant,*
The ProImmune Company, LLC

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PROIMMUNE COMPANY, LLC, a Delaware limited liability company;<br><br>Plaintiff,<br>v.<br><br>HOLISTA COLLTECH LTD., an Australian corporation; and DOES 1-50, inclusive;<br><br>Defendants. | Case No.: 7:20-cv-01247-KMK |

**PLAINTIFF/COUNTERCLAIM-DEFENDANT THE PROIMMUNE COMPANY, LLC'S**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFEDANT/COUNTERCLAIM**

**PLAINTIFF HOLISTA COLLTECH LTD'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 4

II.   FACTUAL BACKGROUND .......................................................................... 6

    A.  Contract No. 4 ........................................................................................ 6

    B.  Holista's complaints under prior contracts and its unfounded complaint as to Product Quality during the time period of Contract No. 4 ..................... 8

    C.  ProImmune delivered conforming Product to the Pick-Up Address and Holista failed to pick it up ....................................................................... 11

    D.  Holista's failure to perform its obligations under Contract No. 4 ............... 11

III.  ARGUMENT ................................................................................................... 12

    A.  ProImmune met all its obligations under Contract No. 4 by delivering conforming Product to the Pick-Up Address and informing Holista that it was available for Pick Up .......................................................................... 12

    B.  ProImmune fully complied with all contract warranties .............................. 15

IV.   CONCLUSION ................................................................................................ 17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Avola v. Louisiana-Pacific Corp.*,
   991 F.Supp.2d 381 (E.D.N.Y. 2013) ............................................................... 15

*Beinstein v. Navani*,
   131 A.D.3d 401 (1st Dept 2015)............................................................... 12, 14

*Brady v. Basic Research, L.L.C.*,
   101 F.Supp.3d 217 (2015) ............................................................................ 15

*CBS Inc. v. Ziff-David Pub. Co.*,
   75 N.Y.2d 496 (1990)..................................................................................... 15

*Galletta v. Stryker Corp.*,
   283 F.Supp.2d 914 ........................................................................................ 16

*Mack v. U.S.*,
   814 F.2d 120 .................................................................................................. 17

*Surge Licensing, Inc. v. Copyright Promotions Ltd.*,
   258 A.D.2d 257 (1st Dept 1999)................................................................... 12

**Rules**

FRCP 56(f)(1) .................................................................................................... 12

Plaintiff/Counterclaim Defendant The ProImmune Company, LLC ("ProImmune") respectfully submits this memorandum in opposition to Defendant/Counterclaim Plaintiff Holista Colltech Ltd.'s ("Holista") motion for summary judgment ("MSJ").

## I.    INTRODUCTION

Holista claims that ProImmune breached the parties' fourth distribution agreement ("Contract No. 4") by failing to supply Product that conformed to various warrantees and specifications. Holista's MSJ misstates facts, contradicts deposition testimony from Holista's CEO, and ignores inconsistent evidence. When *all* of the evidence is considered, no arguable material facts are disputable, but ProImmune, rather than Holista, is entitled to summary judgment.

First, Holista claims that ProImmune failed to supply certain Product, but ProImmune supplied all of the Product it was obligated to supply, including all Product purchased pursuant to the terms of Contract No. 4. Contract No. 4 only obligated ProImmune to "deliver the Product to the Pick-Up Address [855 N. McCormick Way, Layton, UT 84041] within the time stipulated by Holista in the purchase order, unless ProImmune notifies Holista of any delay." ProImmune delivered the Product to the Pick-Up Address and asked when Holista would pick it up. Holista never picked it up.

Second, Holista claims that some Product failed to meet contractual specifications with respect to amino acid content, but all the Product supplied did, in fact, conform to all specifications. The third-party manufacturer UST Sales Corp. ("UST")  verified this by a certificate of analysis ("CofA"). The CofA proves, based on laboratory analysis, that the finished product met its specifications, including with respect to amino acid content. The only ingredients in the Product are three amino acids and a trace amount of selenium. Holista's claims UST's

testing was contradicted by Holista's customer's testing which showed the amino acid content

was less than 50%. Even if that was the end of the story, that would make the amino acid content

a disputed fact.

Yet it is not a disputed fact, because Holista's CEO admitted in deposition that the

Product conformed to specified amino acid content. This contradicts Holista's current argument.

Also on the subject of contradictory allegations, Holista claims that ProImmune and UST did not

address Holista's concerns about the amino acid content discrepancy, but that is again false.

ProImmune gave substantive responses to Holista's concerns and supplied the results of various

laboratory testing to demonstrate the product conformed to specifications. In addition, Holista

neglects to mention that the testing which allegedly resulted in an amino acid content of less than

50%, was not even testing Product directly. It was testing a product called "EDG3" for which the

Product was one component. Holista further fails to mention that their customer directly retested,

this time (allegedly) testing the Product directly, and the results demonstrated an amino acid

content of approximately 88%.

Third, Holista claims that ProImmune violated warrantees with respect to texture, taste,

and color, but ProImmune met all such warrantees. Holista never complained about texture,

taste, or color with respect to any Product under Contract No. 4. and Contract No. 4 had no

specifications or warrantees for texture or taste. ProImmune could not have breached Contract

No. 4 with respect to texture and taste when they were not contractual warranties. Nor did

Holista ever attempt to reject or decline any product on the basis of text, taste, or color, despite

having a clear mechanism to do so under the contract.

Fourth, Holista claims ProImmune improperly packaged product for international

shipping, but ProImmune was not responsible for shipping or for providing any particular sort of

packaging. ProImmune was responsible for delivering the Product to the Pick-Up address. Once there, Holista was responsible for shipping. This is made explicit in Contract No. 4, and Holista has admitted this in deposition. If Holista wanted the Product packaged in a certain way, that was their prerogative and their responsibility.

Fifth, Holista did not perform its obligations under the contract. Holista was obligated to purchase 12,000 kg of the Product by February 2019. It only paid $222,700 for 2,500 kg by September 2018, and $89,100 for another 1,000 kg of Product in February 2019. Holista did not purchase the quantities agreed to by the date agreed to and therefore cannot enforce a breach of contract against ProImmune when it has failed to perform its obligations in the first place.

The evidence in this case demonstrates that there can be no factual dispute sufficient to sustain Holista's MSJ. The evidence demonstrates, on the other hand, that there is no material factual dispute as to granting ProImmune summary judgment, and ProImmune respectfully requests the Court do so.

## II.    FACTUAL BACKGROUND

### A.        Contract No. 4

Between March 2015 and January 2017, the Parties entered into three distribution agreements in which ProImmune appointed Holista as the exclusive distributor of the Product for certain Asian countries. (ProImmune's Response to Holista's Statement of Undisputed Material Facts ("RSUMF") ¶ 1.) None of those contracts are at issue in Holista's counterclaims. (*Id*.)

On September 1, 2018, the Parties entered into a fourth distribution agreement ("Contract No. 4"). (*Id*.) As with the prior agreements, Holista "agree[d] to purchase…not less than the minimum quantities of Product in order to meet the Minimum Annual Performance Requirements." (Declaration of Dr. Rajen Manicka in Support of Holista MSJ ("Dr. Rajen

Dec.") ¶ 3, Ex. A [Section 3.1 and Schedule 3].) Those requirements were 12,000 kg of Product, over the span of approximately seven (7) months. (*Id*.)

Contract No. 4 required ProImmune to "deliver the Product to the Pick-Up Address within the time stipulated by Holista in the purchase order, unless ProImmune notifies Holista of any delay." (*Id.* [Section 3.6]; RSUMF ¶ 21.) Upon pick-up by Holista at the Pick-Up Address, risk of loss passed on to Holista. (Dr. Rajen Dec. ¶ 3, Ex. A [Section 4.2].) Holista had the right to inspect and reject non-conforming Product within twenty-one days from the Pick-Up Date. (*Id*. [Section 4.1]; RSUMF ¶23.) Along with risk of loss, title also passed to Holista at the time of pick up. (Dr. Rajen Dec. ¶ 3, Ex. A [Section 4.3].) Holista never rejected Product, within contractual timelines or otherwise. (RSUMF ¶ 23.)

ProImmune warranted that the Product was not subject to any security interest, was of satisfactory quality, free of residuals and contaminants, fit in all respects or the purpose(s) for which the Product was intended to be used, that it shall comply with all and any specifications provided for such Product. (RSUMF ¶ 3.) ProImmune also warranted that the Product "at the time of the Pick-Up Date, conforms to the ingredient of such Product as described in the label, package inserts, and packaging," and that it was suitable for distribution and/or retailing to the customer in accordance with any applicable laws. (*Id*.) ProImmune also warranted that the literature and information supplied in relation to the Product was true, complete, and accurate in every respect.[1] Other than those express warranties, the only other terms as to the Product in Contract No. 4 established a mesh size of "at least 90% through 40 mesh and <10% through 325 mesh" and had the color of the Product as "white to off-white powder." (*Id*.)

---

[1] Certain other warranties were included in Contract No. 4 which are not at issue here.

**B.  Holista's complaints under prior contracts and its unfounded complaint as to Product Quality during the time period of Contract No. 4**

At various times throughout the Parties' relationship prior to Contract No. 4, Holista had complained to ProImmune regarding shipping and packaging (primarily) and, on one occasion, issues with texture. (RSUMF ¶ 17.) All of these complaints were during the time period of the first three distribution agreements. (*Id*.) And, regardless, ProImmune had no obligations under the contracts as to shipping and packaging. (*Id*. ¶ 18.) Holista's CEO admitted that it was responsible for shipping in deposition:

> Q. … you were responsible for all the shipping arrangements regardless of how RFI and PNP and UST [ProImmune's manufacturers] were doing it [packaging], right?
>
> A. Yeah.
>
> Q. And do you end up purchasing insurance for shipping problems?
>
> A. I can't remember. We may have. I can't remember.

(Declaration of Ryan Abbott ("Abbott Decl.") ¶ 3, Ex. B [12/1/20 Deposition of Dr. Rajen Manicka ("Dr. Rajen Depo. II") at 21:21-22:1.)

ProImmune also had no obligations as to texture and taste. (RSUMF ¶ 18.) And, again, Holista never attempted to reject Product—either through the mechanism provided by the contract or otherwise.

As to Contract No. 4, around August 2019, Holista notified ProImmune that it's client QNet had tested Product it received from Holista at a lab called Alpha Testing Lab. It purportedly found that the amino acid content of the Product was less than 50%. (RSUMF ¶ 19.) Later, that customer purportedly sent Product for testing to another lab called EuTech, which found the amino acid content to be around 88%. (*Id*.) Holista fails to mention that Alpha Testing Labs was not testing Product, but rather a product called "EDG3" which incorporated Product with other ingredients. (Abbott Dec. ¶ 3, Ex. B [Dr. Rajen Depo. II] at 215:19-24.) In any case,

the gross disparity in results between these two labs suggests, in a best-case scenario, that the

testing was unreliable. Holista's CEO admitted to this in deposition:

> Q. Were they [Alpha Testing Labs] testing EDG[3] here or the raw Immune formula --
>
> A No. They were testing EDG[3]. They were testing EDG[3]. But unlikely where we said we had so many compounds they were just testing EDG for its pure amino acid content.
>
> Q -- did the EuTech come after the Alpha testing?
>
> A. Yes, they did.
>
> Q. Right. And actually that one came back kind of substantially different from the Alpha testing, right?
>
> A. Yes.
>
> Q. Leaving you to think that maybe these tests weren't that reliable?
>
> A. Yes.

(*Id.* at 215:19-24, 224:2-11.)

Contrary to Holista's claims in its MSJ, ProImmune engaged in extensive discussions

with Holista and UST about the Product's amino acid content. (RSUMF ¶ 13.) Over the next few

months, ProImmune supplied Holista with a CofA for the final shipped Product, testing of the

individual amino acid that comprise the finished Product, and the results of a stability test to

determine whether the amino acid content could have degraded over time. (RSUMF ¶ 20.) Those

certificates and tests all confirmed that ProImmune provided Holista with Product that

conformed to all warranties and expected composition.

As stated in the Declaration of Stephen G. Chadwick ("Chadwick Dec."), Vice President

at UST, a CofA was generated for the questioned lot that demonstrated the finished product met

all its specifications. (Chadwick Dec. ¶¶ 6-8.) UST uses an independent, third-party verification

system for raw materials and finished product testing, using ISO-17025 accredited laboratories

which are regularly audited. (*Id.* ¶ 17.) UST is registered with the U.S. Food and Drug

Administration (FDA) and compliant with good manufacturing practices enforced by the FDA. (*Id*. ¶¶ 13-16.)

But resolution of this issue is not contingent on which laboratory results are more accurate. There can be no factual dispute that the Product met specifications given that Holista's CEO admitted this Product conformed to specification in his deposition:

> "Q: And this was the questioned lot, right?
>
> A: Yes.
>
> Q: And that –
>
> A: That's correct.
>
> Q: -- it basically shows in the – the COA [Certificate of Analysis] that everything tested fine?
>
> A: Yes."
>
> […]
>
> Q: "…they also have this tested from Advanced Laboratories and Dyad testing for the Glycine, Glutamate, Cysteine, and Selenium. And that all turned out okay. Right?
>
> A: Yes.
>
> Q: Right. And so, again, from your position this really wasn't an issue except [that] ProImmune didn't want to get on the phone and explain to QNet why there wasn't a problem and that they had all this verifiable information.
>
> A: Yes."

(Abbott Dec. ¶ 3, Ex. 2 [Dr. Rajen Depo. II] at 228:4-9, 231:8-15.)

The stability test was provided because the Product Holista's client complained of was manufactured and picked-up nearly a year before Holista's complaint. (RSUMF ¶¶ 6 and 20.) Holista is required to inspect and reject Product within 21 days of pick-up and did not do so with respect to this Product. In fact, it did not reject Product within 21 days of pick-up ever. (*Id*. ¶ 23.) Holista's CEO testified to this in his deposition. Specifically with respect to Contract No. 4:

Q. And once again, though, perhaps you could have, no product was rejected or refused or returned under this agreement, right?

A. Yes.

Q. Okay. And again you never exercised [y]our right to inspect the product before pickup?

A. No.

(Abbott Dec. ¶ 3, Ex. B [Dr. Rajen Depo. II] at 184:2-9.)

Holista was not actually complaining about the composition of Product acquired under Contract No. 4, but of Product it obtained from a prior contract. (RSUMF ¶6.) The questioned had Lot # 1015811. (*Id*.) This batch was manufactured in November 2018, fully paid for by Holista by August 2018, and it was received (not the date it picked the Product up) by February 1, 2019. (*Id*.) Holista's first complained to ProImmune in August 2019 – more than 5 months past the rejection deadline. (*Id*.)

### C. ProImmune delivered conforming Product to the Pick-Up Address and Holista failed to pick it up

ProImmune was required to make the Product available for "Pick-up" at the Pick-Up Address, which was the manufacturer's address, and inform Holista when it was ready. (RSUMF ¶ 21.) ProImmune did just that. (*Id*.) Instead of picking up the Product, Holista never responded. (*Id*.) In order to mitigate the loss of $311,850 worth of Product, ProImmune sold it to a third party. (*Id*. ¶ 15.) ProImmune remains ready and willing to provide Holista with the $311,850 worth of Product, should Holista be willing to pick the Product up. (*Id*. ¶ 16.)

### D. Holista's failure to perform its obligations under Contract No. 4

Holista has failed to meet its minimum purchase requirements under Contract No. 4. (*Id*. ¶ 22.) For Contract No. 4, with respect to the 2018 purchases, Holista only purchased 3,500 kg at a total cost of $311,850.00. (*Id.* ¶ 22.) Holista failed to purchase 8,500 kg as required. (*Id*.)

Holista complains that ProImmune breached Contract No. 4 when Holista cannot demonstrate it performed its obligations or otherwise was excused from performance. (*Id.*)

## III.   ARGUMENT

The evidence demonstrates that ProImmune did not breach Contract No. 4 or any of the warranties. As the Court is authorized to grant summary judgment to the non-moving party (FRCP 56(f)(1)), and since there are no material facts actually disputable by Holista that would prevent the Court doing so, ProImmune respectfully requests the Court deny Holista's motion for summary judgment and grant summary judgment in favor of ProImmune instead.

### A.   ProImmune met all its obligations under Contract No. 4 by delivering conforming Product to the Pick-Up Address and informing Holista that it was available for Pick Up.

ProImmune met its obligation of delivering the Product to the Pick-Up Address and Holista's claim for breach of contract is without merit. "Absent ambiguity, the unequivocal language of the parties' contract controls." *Surge Licensing, Inc. v. Copyright Promotions Ltd.*, 258 A.D.2d 257 (1st Dept 1999). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Beinstein v. Navani*, 131 A.D.3d 401, 405 (1st Dept 2015) [citation omitted]. "[C]ourts may not by construction add or exercise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.*

In arguing that ProImmune breached Contract No. 4, Holista points to no provision or language of the contract that ProImmune breached. (Holista MSJ at 4-5.) Holista only argues that there is no dispute as to the existence of the Agreement, or that Holista "performed" only by paying ProImmune $311,850.00. (*Id.*) In that same sentence, Holist admits that the Product it paid for "it never picked up or received" as a result of purported complaints that were never cured. (*Id.*)

According to the plain, unambiguous language of Contract No. 4, "[t]hroughout the continuance of this Agreement, ProImmune shall deliver the Product to the Pick-Up Address within the time stipulated by Holista in the purchase order, unless ProImmune notifies Holista of any delay." (RSUMF ¶21.) "Pick-up Address" is defined as "the address of the manufacturer of the Product specified by ProImmune in its Invoice of the Purchase Order." (*Id.* ) Thus, ProImmune was obligated to deliver the Product only to the manufacturer's address, which it did, and then inform Holista that it could pick the Product up from there, which it also did. (*Id.*)

Holista admits it never picked up "a large portion" the Product under Contract No. 4. (Holista MSJ at 5.) Holista's CEO, however, has stated in a response to interrogatory that they never picked up any of it. (Dr. Rajen Dec. ¶ 6, Ex. B.) Holista claims that ProImmune breached the contract, but Holista has not cited to any specific language for breach. That is because no breach occurred.

Additionally, Holista was required to "inspect all Product within twenty-one (21) days from the Pick-Up Date to ensure the Product meets the Acceptance Requirements. Any Product that does not comply with the Acceptance Requirements may be rejected by Holista or its customers[.]" (*Id.*, ¶ 3, Ex. A [Section 4.1] RSUMF ¶23.) The "Pick-up Date" was the date indicated in the invoice for that purchase. (Dr. Rajen Dec. ¶ 3, Ex. A [Section 1.1.12].) The "Acceptance Requirements" provided six grounds for rejection: (1) wrong item/quantity; (2) wrong batch/expiry; (3) damage upon collection/receipt by Holista; (4) Holista did not order; (5) damaged stock; and (6) product recall. (*Id.* [Section 1.1.1].) Holista never once rejected Product, nor did it raise any issues with Product within the required time period. (RSUMF ¶ 23.)

As to the quality of the Product that Holista argues breached the Parties' agreement, Holista claims that "the amino acid content of the Product was 50% less than what ProImmune

warranted in the contract and Certificate of Assurance (*sic*) to Holista." (Holista MSJ at 5.) Holista also claims that it asked for an explanation or refund, but that the Product issues were "never cured." (*Id.*)

Tellingly, Holista fails to identify what batch of Product was at issue. The batch was Lot # 1015811—a batch that was manufactured in November 2018 and received by Holista in February 2019. (RSUMF ¶ 6.) A batch that was manufactured under the parties' third agreement and not Contract No. 4. (*Id.*) It was not until 6 months after Holista received it (even later than when it picked the Product up) that Holista first raised an issue. Holista failed to comply with section 4.1 of Contract No. 4 and reject the Product in a timely manner. After ProImmune provides Product to Holista, ProImmune no longer has any control over the Product or means of directly ensuring quality. Holista ships the Product internationally, stores it, further distributes it, incorporates it into subsequent products, etc.

Holista also fails to inform the Court that its own customer re-tested the Product batch and found the amino acid content was around 88%. (RSUMF ¶ 19.) At best, Holista's customer utilized inaccurate testing. More likely, Holista or Holista's customer was looking for an excuse to get out of or renegotiate purchase obligations.

Holista also argues that it never "received [Product] due to numerous packaging complaints," among others. (Holista MSJ at 5.) Again, Holista fails to point to any language in Contract No. 4 that obligated ProImmune to provide certain packaging or shipping materials. (RSUMF ¶18.) The reason no provisions are cited is because Holista was responsible for shipping. (*Id.*) "Risk in the Product shall pass to Holista on the date on which Holista collects the Product at the Pick-Up Address." (Dr. Rajen Dec. ¶ 3 Ex. A [Section 4.2].) "Title to the Product shall pass from ProImmune to Holista at the point in time that Holista collects the Product at the

Pick-Up Address and ProImmune receives full payment for the Product." (*Id.* [Section 4.3].)
Holista's CEO admitted in deposition that Holista was wholly responsible for shipping. (RSUMF
¶ 18.)

Holista's argument for breach also fails because Holista indisputably failed to perform its
obligations in purchasing 12,000 kg of Product over the term of the contract. (RSUMF ¶ 22.)
ProImmune fully disputes that "Holista performed by paying ProImmune the sum of
$311,850.00" (Holista MSJ at 5) because that was not Holista's full performance. Among other
obligations, Holista was required to purchase 12,000 kg of Product by February 2019 at the
latest. (RSUMF ¶ 22.) It had only paid for the purchase of 2500 kg by then. (*Id.*)

There are many defects to Holista's claim for breach of contract. Holista ignores the
language which demonstrates that ProImmune fully performed its obligations. Contrary to
Holista's arguments, it is ProImmune that is entitled to judgment as a matter of law, because it
fully performed its obligations under Contract No. 4.

### B.  ProImmune fully complied with all contract warranties

Holista has admitted that ProImmune provided Product that conformed to all
specifications and warranties. "New York breach of express warranty claims require (i) a
material statement amounting to a warranty; (ii) the buyer's reliance on this warranty as a basis
for the contract with his immediate seller; (iii) the breach of this warranty; and (iv) injury to the
buyer caused by the breach." *Brady v. Basic Research, L.L.C.*, 101 F.Supp.3d 217, 235 (2015)
(citing *Avola v. Louisiana-Pacific Corp.*, 991 F.Supp.2d 381, 391 (E.D.N.Y. 2013) and *CBS Inc.
v. Ziff-David Pub. Co.*, 75 N.Y.2d 496 (1990).) ProImmune's Product fully complied with all
contractual warranties and Holista's claim fails as a matter of law.

The argument that ProImmune provided Product to Holista that had an amino acid content reduced by 50% is a misrepresentation of the facts and willful ignorance of contrary evidence. It was Holista's customer that claimed the Product supplied was less than 50% amino acid content as represented, and this testing was done on another product that incorporated ProImmune's Product. (RSUMF ¶ 19.) Subsequently, Holista's customer re-tested Product and had a result of 88% amino acid content. (*Id.*) ProImmune's manufacturer proved the Product conformed to the specifications as agreed to between the parties. (RSUMF ¶ 20.)

Also contrary to Holista's argument, ProImmune addressed Holista's concerns, provided a certificate of analysis for the finished product and test results for each individual amino acid, and performed a stability test to ensure the Product would not break down after time. (*Id.*) Holista cites to testimony of ProImmune's CEO for the acknowledgement that a significant reduction would change the product, that the only way to ensure conformity to specifications is to test it, and that the amino acid content would not reduce overtime. (Holista MSJ at 7.) None of those acknowledgements stand for the fact that *this particular* batch had any problems with it. General hypothetical statements are not evidence of breach of a warranty for specific product.

The fact that Holista's CEO admitted in deposition that this challenge batch conformed to the specifications the parties agreed to should put this issue to rest. (Abbott Dec. ¶ 3, Ex. B [Dr. Rajen Depo. II] at 218:23-219:3, 221:18-22, 222:20-224:11, 225:17-23, 228:4-9, and 236:22-237:7.) It is unbelievable that Holista would claim now that the Product breached express warranties, when it has admitted under oath previously that it did not. Such conduct is prohibited in the 2nd Circuit. *See Galletta v. Stryker Corp*., 283 F.Supp.2d 914, 916 ["Plaintiff is attempting to change his testimony in contravention of settled law in this Circuit, which bars a court sitting on a motion for summary judgment from considering affidavits that contradict prior deposition

testimony." (citations omitted)]; *see also Mack v. U.S.*, 814 F.2d 120, 124 ["It is well settled in

this circuit that a party's affidavit which contradicts his own prior deposition testimony should be

disregarding on a motion for summary judgment." (citations omitted).] The Court should reject

Holista's evidence as contradictory to its prior sworn testimony and ProImmune respectfully

request the Court does.

Holista's claim for breach of express warranties is meritless. There is no actual dispute

based on the entirety of the record that ProImmune never breached any warranties. Rather than

Holista being entitled to summary judgment, the evidence demonstrates that summary judgment

should be granted in favor of ProImmune. ProImmune respectfully request the Court grant

summary judgment in its favor.

## IV.   CONCLUSION

When all evidence is put before the Court, Holista's claims for breach of contract and

breach of express warranty fail. ProImmune completely performed its obligations, and Holista

did not.

ProImmune respectfully requests that the Court deny Holista's motion for summary

judgment, and grant summary judgment in its favor instead.


Dated: July 15, 2021                          **BROWN NERI SMITH & KHAN, LLP**


                                              By:    s/ Ryan Abbott
                                                     Ryan Abbott

                                              11601 Wilshire Blvd., Ste. 2080
                                              Los Angeles, CA 90025
                                              (310) 593-9890

                                              *Attorney for Plaintiff/Counterclaim Defendant,*
                                              The ProImmune Company, LLC

## PROOF OF SERVICE

      I am a resident of the State of New York, over the age of eighteen years, and not a party to the within action.  My business address is: Brown, Neri Smith & Khan LLP, 11601 Wilshire Blvd., Suite 2080, Los Angeles, CA 90025.  On the date below, I served the document(s) as follows:

- **PLAINTIFF/COUNTERCLAIM-DEFENDANT THE PROIMMUNE COMPANY, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFEDANT/COUNTERCLAIM PLAINTIFF HOLISTA COLLTECH LTD'S MOTION FOR SUMMARY JUDGMENT**

☒      **BY ELECTRONIC MAIL:** I caused such document(s) to be electronically mailed in PDF format as an e-mail attachment to each addressee for the above-entitled case.  The transmission was complete and confirmed.  A copy of the transmittal e-mail will be maintained with the original document(s) in our office.

To the addresses on the following address:

      Natraj S. Bhushan, Esq.
      Turturro Law P.C.
      1602 McDonald Ave.
      Brooklyn, NY 11230
      E: natraj@turturolawpc.com

      Attorneys for Defendant/Counterclaim Plaintiff,
      Holista Colltech, Ltd.

      I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.  Executed on July 15, 2021, at Albany, NY.

_____
      Rowennakete P. Barnes