Ryan B. Abbott (5053673)
 ryan@bnsklaw.com
Rowennakete P. Barnes (5528955)
 kete@bnsklaw.com
**BROWN NERI SMITH & KHAN, LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Plaintiff/Counterclaim-Defendant,*
The ProImmune Company, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PROIMMUNE COMPANY, LLC, a Delaware limited liability company;<br><br>              Plaintiff,<br>v.<br><br>HOLISTA COLLTECH LTD., an Australian corporation; and DOES 1-50, inclusive;<br><br>              Defendants. | Case No.: 7:20-cv-01247-KMK |

## **PLAINTIFF/COUNTERCLAIM-DEFENDANT THE PROIMMUNE COMPANY, LLC'S**

## **REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS**

## <u>**MOTION FOR SUMMARY JUDGMENT**</u>

1

Plaintiff/Counterclaim Defendant The ProImmune Company, LLC ("ProImmune") respectfully submits this reply memorandum in support of its motion for summary judgment ("MSJ").

## I. INTRODUCTION

Defendant/Counterclaim-Plaintiff Holista Colltech Ltd. ("Holista") makes a series of arguments in opposition to ProImmune's MSJ. These arguments misstate the factual record, ignore inconvenient evidence, or rely on misleading or irrelevant claims.

Although ProImmune already specifically pointed out the contradictory nature of Holista's CEO's declaration in opposing Holista's MSJ (*See* ECF 65-2), Holista once again submits the same sham declaration to claim ProImmune waived compliance with minimum purchase agreements.

As to Contracts Nos. 1 and 2, it is undisputed that Holista did not purchase the required amounts of Product. Holista now argues that ProImmune failed to perform by not providing notice of breach, but Holista relies on an unrelated contract provision to support this position. In any event, ProImmune repeatedly provided notice to Holista.

As to Contract No. 4, Holista claims that it "outlined several material breaches" in disputing ProImmune's performance. With respect to the claim ProImmune provided non-conforming Product, in Holista's response to interrogatories, it admitted that it never received any Product under Contract No. 4. The emails between the parties also demonstrate that Holista never picked up any Product under Contract No. 4, and that there were no complaints with respect to Contract No. 4. If Holista never received any Product, it is impossible to claim that ProImmune breached Contract No. 4 by providing non-conforming Product. As to Holista's shipping claims, ProImmune had no obligations under Contract No. 4 regarding shipping. This is

why Holista fails to cite any contract provision to support that argument.

While ProImmune could have terminated Contract No. 4 for Holista's failure to perform, it did not, and Holista further admitted that Contract 4 was not terminated. This means that Holista's annual purchase requirements renewed, and ProImmune has been damaged by Holista's failure to make those purchases since 2019.

Holista also incorrectly claims that ProImmune is not entitled to the general lost profits damages, and mistakes a provision prohibiting consequential lost profits to argue that ProImmune is precluded from recovering anything. This argument is not only counter to well-established law, it would render the contracts between the parties essentially illusory. Holista also disputes ProImmune's calculation of damages but provides no evidence to support its dispute.

The evidence demonstrates that ProImmune is entitled to summary judgment and ProImmune respectfully requests the Court grant it.

## II. ARGUMENT[1]

### A. No factual issues exist as to whether Holista breached Contracts Nos. 1, 2 and 4, once Holista's CEO's sham affidavit is disregarded

Holista's CEO admitted repeatedly in deposition that ProImmune never waived compliance with minimum purchase requirements under any contract between the parties. Holista's CEO now changes his story in the declaration and claims the opposite. The following sets forth representative deposition testimony and contrary declaration statements:

| Deposition Testimony | Declaration Statements |
|---|---|
| "Q: Right. And what about the minimums for the prior contracts when the new contract was signed? | "These issues lingered throughout the time period in which the Contracts were in effect (2015-2019) and, for these reasons, Dr. Crum, who was |

---

[1] Other than the cites to the undisputed statement of material facts, Holista's "background facts" are characterizations and conclusions, rather than facts.

3

| | |
|---|---|
| A: Typically it would be very close to completion, like one ton or two ton (sic) behind.<br><br>Q: An – and it was expected that you would catch that up at some point?<br><br>A: Yes.<br><br>Q: So Dr. Crum wanted prior contracts to be completed. They would get kind of near completion. And anything that was behind there was an expectation that you would catch up on as you moved forward?<br><br>A: Yes. There was an understanding."<br><br>ECF 54, Abbott Decl. ¶ 3, Ex. B (Manicka Depo. II), at 76:6-19.<br><br><br>"Q: Got it. With these – with these prior amounts from former contracts, even though Dr. – so just to be clear on this – so Dr. Crum wanted prior contracts resolved or completed. You would get pretty close on completing them. And then, you know, the expectation was that any outstanding orders would eventually be placed or caught up with at some point?<br><br>A: It was never—it was mutually agreed. It was never done. Obviously we would have done our part if he could fix the issues."<br><br>*Id*. at 81:9-21.<br><br><br>"Q: And so, I totally get that. But it—it was up until the time that you considered all of these agreements terminated, your intent to catch up on all of the prior minimum annual performances, right?<br><br>A: Most definitely.<br><br>Q: Any it was never your understanding that Dr. Crum said something like don't worry about past amounts ordered because he was constantly trying to get you to pay for orders to catch up on that, right."<br><br>A: Yeah."<br><br>*Id*. at. 82:17-83:4. | (and still is) ProImmune's CEO, waived any strict compliance with the annual minimums set forth in Contract 1 and Contract 2. This waiver was effectuated through Dr. Crum's discussions with me during our calls, several emails exchanged between the parties, and evidenced by the course of the parties' custom and dealings in entering into new, subsequent distribution contracts rather than ProImmune claiming Holista was in breach. Indeed, Dr. Crum readily concedes this understanding of the parties in his Declaration: "ProImmune entered into Contract No. 2 and Contract No. 4 when Holista had outstanding minimum purchase requirements that it was not compliant with…" Crum Declaration at ¶7."<br>ECF 72-4, Declaration of Dr. Rajen Manicka, ¶ 7.<br><br>"Instead, as ProImmune represented to Holista and Holista relied on before entering into a new distribution agreement, the issue of failing to meet the prior year's minimum annual purchases was never considered a breach of Contract 1, or Contract 2; instead this provision was effectively deemed waived by this conduct, or at minimum, there are issues of fact concerning the waiver defense/ProImmune's satisfactory take on Holista's compliance with Contract 1 or Contract 2" *Id*. ¶ 8.<br><br>*"This course of conduct (at the end of the one year, initial expiry period, Holista would draft a new business plan, which ProImmune had input on, and then the parties enter into a new distribution agreement) further* |

4

| | |
|---|---|
| "Q: But there was no point where Dr. Crum explicitly said, you know, in doing this don't worry about prior minimum annual performance from agreement one, correct?<br><br>A: No, no."<br><br>*Id*. at 97: 1-6.<br><br>"Q: And so, he was there kind of pointing out that, you know, he – even with a new contract you were still out of compliance on the old ones and it was your intention to catch up on those?<br><br>A: Yeah, yes."<br><br>*Id*. at 123:12-17.<br><br>"Q: Right. And we already discussed this, but again it was kind of your understanding at some point you were going to catch up on all these overdue amounts and you never wrote back and said anything like, hold on, these are old agreements, I'm not liable for those minimum amounts anymore, right? "<br><br>A: No. He knew that because he kept supplying.<br><br>*Id*. at 181:19-182:3. | *buttresses the idea that the prior year's contract's annual minimum was deemed waived when the new contract was entered into. See, e.g.,* Contract 1 and Contract 2 at Section 13.2 (discussing extending the term of the contract)." *Id*. ¶ 9.<br><br>"The simple fact of the matter was that Holista was ProImmune's largest distributor, and during the years in which the Contracts were in effect, there were compliance issues on both parties sides, and Dr. Crum repeatedly made promises to me that went beyond the express terms of the Contract regarding the waiver of annual minimum purchases for prior Contracts, providing better packaging for Product (given Holista's complaints) and allowing for refunds and return after pick-up, shipment and inspection by Holista's end-customers; and, I, in turn, promised to do what I could to meet Holista's sales targets." *Id*. ¶ 10. |

"The 'sham issue of fact' doctrine 'prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony.'" *Moll v Telesector Resources Group, Inc.*, 760 F3d 198, 205 [2d Cir 2014]. "Thus, factual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial." *Id*.

Holista also contends that ProImmune's CEO "concedes" to waiver, incompletely citing to Dr. Crum's declaration, and cutting off the pertinent language that states, "ProImmune and Holista agreed that those minimum purchases would be brought into compliance and were not waived," in the context of entering into subsequent agreements. (ECF 50, Dr. Crum Decl. ¶ 7.) Holista also mis-cites Dr. Crum's testimony claiming that contracts were renewed by mutual

5

consent "despite Holista's non-compliance." (Holista Opp. at 7.) Dr. Crum testified to no such thing. Rather, he testified that the Contract was renewed after the initial term expired, and that he knew Holista had not met minimum purchase requirements, but that "they made compelling promises that they were going to bring it into compliance." (ECF 72-2, Ex. 1 to Bhushan Decl. at 34:9-35:10.) Dr. Crum's testimony is completely consistent with his declaration.

Holista further argues that because Contract No. 1 provided the parties an option to renew if Holista's performance was compliant, that it—for some unexplained reason—distinguishes the situation from the parties in *Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.,* 686 F.Supp.1015, 1023 (S.D.N.Y. 1988). It does not. The parties in *Seven-Up* had agreed to modify their contracts only in writing, which the Court applied in determining whether Seven-Up had breached the original contract and subsequent amendments. *Id.* The *Seven-Up* court further held that other than the specific written modification, no course of conduct—including PepsiCo repeatedly reminding Seven-Up of its purchase obligations, yet continuing the relationship for years—amounted to any other modification. (*Id.*) The fact that Holista and ProImmune had "an option to renew this Agreement," and then entered into subsequent agreements that made no mention of prior purchase requirements, or a waiver thereof, in no way distinguishes this case from *Seven-Up*. In fact, the parties here had the same requirement that any modification be in writing in every single agreement at issue. (ECF 50-52, Dr. Crum Decl. ¶¶ 2-4, Exs. A-C at Sections 16.2.) None of the Contracts subsequently modified or waived Holista's obligations under any agreement.

### B. ProImmune was not required to provide notice but still did so repeatedly

The notice provision that Holista cites to pertains to <u>termination</u> of the agreement, and regardless, Holista had repeated notice. "When a party materially breaches a contract, the non-

6

breaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach." *Bigda v Fischbach Corp.*, 898 F Supp 1004, 1011 [SDNY 1995].

Holista claims that section 13.4.1 of Contracts Nos. 1 and 2 required ProImmune to provide Holista with notice of breach and the cure-period to fix any breach before ProImmune could sue and recover damages. However, that section, under the heading titled "DURATION AND TERMINATION" (ECF 50-52, Dr. Crum Decl. ¶¶ 2 and 3, Exs. A and B, Sections 13.4.1), only applies to terminating the contract. The language, in relevant part, states:

> "either Party shall be entitled forthwith to terminate this Agreement with immediate effect by written notice to the other party if: 13.4.1 such other Party commits a material breach of any of the provisions of this Agreement, and in the case of a breach capable of remedy, fails to remedy the same within thirty (30) days after receipt of written notice from the terminating party giving full particulars of the breach and requiring it to be remedied."

(*Id*.) The section contains no obligations related to ProImmune electing to continue performance and suing thereafter for damages.

In any event, ProImmune repeatedly informed Holista that it had failed to meet minimum purchase requirements and was in breach of the agreements. (SUMF ¶ 42; *See also* ECF 54, Abbott Decl. ¶ 3, Ex. B at 58:5-8, 58:14-19, 121:22-122:9, 123:4-17, 141:3-8, 164:24-165:3, 168:22-169:1; 182:18-20, 212:5-8.)[2]  Contract Nos. 1, 2 and 4, in Section 18.1 allow for notice by email, and providing notice either verbally or in writing via email (both of which ProImmune did) was in any case adequate notice as, "strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation." *Thor 725 8th Ave. LLC v. Goonetillke*, 138 F.Supp.3d 497, 509-510

---

[2] Holista's dispute to this material fact is statements from its CEO's sham declaration claiming that ProImmune never informed Holista that it failed to meet minimum purchase requirements. Holista's CEO testified repeatedly that ProImmune did provide this notice.

7

[S.D.N.Y. 2015]. While Holista now claims that ProImmune did not provide notice, the evidence proves otherwise. (Abbott Reply Decl. ¶2, Ex. A.)

And contrary to Holista's argument that ProImmune cannot submit evidence on reply, "reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway Refining Co. v. Oxygenated Marketing and Trade A.G.*, 215 F.3d 219, 226-227 (2nd Cir. 2000) [affirming the district court's decision accepting evidence submitted in reply in response to argument made in opposition].

### C. ProImmune delivered Product to the Pick-Up Address in fully performing Contract No. 4, Holista never picked up any Product under Contract No. 4, and Holista's complaints are either false based on the evidence submitted, or were complaints for which ProImmune had no contractual obligations

Holista has failed to dispute that ProImmune delivered the Product to the Pick-Up Address and notified Holista of such, which fulfilled ProImmune's performance obligations. Contract No. 4 states that "ProImmune shall deliver the Product to the Pick-Up Address within the time stipulated by Holista in the purchase order, unless ProImmune notifies Holista of any delay." There is no requirement for ProImmune to do anything other than this, including anything shipping related.

On February 22, 2019, ProImmune notified Holista that, "there are orders that are awaiting your pick-up confirmation." (ECF 51, Dr. Crum Decl. ¶ 15, Ex. F at p. 3.) Under Contract No. 4, Holista was permitted to pick up Product after it made the second half payment for any purchase order. (*Id.* ¶ 4 Ex. C, Schedule 1, ¶ 3.) Holista made its last payment on January 7, 2019 and Holista's last receipt of Product (under Contract No. 3) occurred on February 1, 2019. (ECF 54, Abbott Decl. ¶ 4, Ex. C.) Holista *never picked up any Product under Contract No. 4.* In the prior email chain referenced, and as corroborated by Holista's interrogatory responses, Holista made its second half payments for purchase orders POM/18/45, POM/18/46,

8

and POM/18/47 on December 21, 2018 and January 7, 2019. (*Id.*) Holista was then notified the next month (after it made its final pick up under Contract No. 3) that "there [were] orders that are awaiting your pick-up confirmation." (ECF 51, Dr. Crum Decl. ¶ 15, Ex. F at p. 3.) This demonstrates that (1) ProImmune performed its obligations under Contract No. 4, and (2) that Holista could not have complained about defective Product under this agreement because it never possessed it. The only evidence in the record demonstrates that Holista never picked up any Product under Contract No. 4.

Holista also argues that ProImmune's committed a "prior" breach and that it complained about shipping issues. According to Contract No. 4's Schedule 3, Holista was required to purchase 4,000 kg of Product by September 2018. It had not made any payment for any purchase until November 2018 and thus, had breached by September 2018. There is no prior breach by ProImmune. As to Holista's complaints regarding shipping, again, ProImmune had no obligations for shipping. (*See generally*, ECF 51, Dr. Crum Decl. ¶ 4, Ex. C.) Holista's CEO acknowledged this. (ECF 54, Abbott Decl. ¶ 2, Ex. A. [Manicka Depo. I] at 137:21-23)

As to the argument for anticipatory repudiation, ProImmune has never terminated communications[3] with Holista and has never refused to provide Product. Holista has not provided, and cannot provide, any evidence to support this argument. The record reflects that Holista never picked up Product that ProImmune made available. There is simply <u>no</u> evidence to supports the claim that ProImmune was going to breach Contract No. 4 and not perform.

### D. ProImmune is seeking only general damages from Holista's breach that were bargained for and contemplated by the Parties

The Contracts preclude the recovery of lost profits as a *consequential damage* and not the *general damages* of lost profits to which ProImmune is entitled. "Lost profits are general

---

[3] The fact that one agent of ProImmune was instructed to cease communication does not mean that ProImmune ceased communication.

damages 'the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract.' On the other hand, lost profits are categorized as consequential damages when the 'non-breaching party suffers loss of profits on collateral business arrangements.'" *Abraham v Leigh*, 471 F Supp 3d 540, 563 [SDNY 2020] (citation omitted). "The [general] damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments." *Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc*., 487 F3d 89, 109 [2d Cir 2007].

ProImmune is seeking general damages of lost profits from Holista not purchasing the minimum requirements, and those profits "are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position [it] would have occupied had the contract been performed." *Id*.

As to the argument that only outstanding invoices were recoverable, Holista again misinterprets the contractual provisions. Those provisions apply "Payment Terms" to outstanding unpaid invoices, and as defined, require Holista to deposit 50% of any purchase order and pay the remaining 50% prior to pick up. (ECF 50-52, Dr. Crum Decl. ¶ 4, Ex. C at Sections 1.1.15, 14.1.4 and Schedule 1, ¶ 3.) Holista also admitted in deposition—and in conformity with the Contract provision—that its minimum purchase obligations were triggered and incurred prior to any of the Contracts' expiring or terminating. (ECF 54, Abbott Decl. ¶ 2, Ex. A, at 142:8-15.)

### III. CONCLUSION

ProImmune respectfully requests the Court grant its motion and enter judgment in its favor.

Dated: August 20, 2021          **BROWN NERI SMITH & KHAN, LLP**

By:    s/ Ryan Abbott
       Ryan Abbott

*Attorney for Plaintiff/Counterclaim Defendant,*
The ProImmune Company, LLC

## PROOF OF SERVICE

I am a resident of the State of New York, over the age of eighteen years, and not a party to the within action. My business address is: Brown, Neri Smith & Khan LLP, 11601 Wilshire Blvd., Suite 2080, Los Angeles, CA 90025. On the date below, I served the document(s) as follows:

- **PLAINTIFF/COUNTERCLAIM-DEFENDANT THE PROIMMUNE COMPANY, LLC'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

☒ **BY ELECTRONIC MAIL:** I caused such document(s) to be electronically mailed in PDF format as an e-mail attachment to each addressee for the above-entitled case. The transmission was complete and confirmed. A copy of the transmittal e-mail will be maintained with the original document(s) in our office.

To the addresses on the following address:

Natraj S. Bhushan, Esq.
Turturro Law P.C.
1602 McDonald Ave.
Brooklyn, NY 11230
E: natraj@turturrolawpc.com

Attorneys for Defendant/Counterclaim Plaintiff,
Holista Colltech, Ltd.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on August 20, 2021, at Albany, NY.

_____
Kete P. Barnes