UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE PROIMMUNE COMPANY, LLC, a
Delaware limited liability company,

                                    Plaintiff,

        v.

HOLISTA COLLTECH LTD., an Australian
corporation *and* DOES 1–50, inclusive,

                                    Defendants.

---

HOLISTA COLLTECH LTD., an Australian
corporation *and* DOES 1–50, inclusive,

                                    Counter Plaintiffs,

        v.

THE PROIMMUNE COMPANY, LLC, a
Delaware limited liability company,

                                    Counter Defendant.

---

No. 20-CV-1247 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Ryan Abbott, Esq.
Rowennakete Barnes, Esq.
Brown Neri Smith & Khan, LLP
Los Angeles, CA
*Counsel for Plaintiff/Counter Defendant*

Natraj Bhushan, Esq.
Turturro Law, P.C.
Brooklyn, NY
*Counsel for Defendants/Counter Plaintiffs*

KENNETH M. KARAS, United States District Judge:

The ProImmune Company, LLC ("ProImmune") brings this Action against Holista Colltech Ltd. and Does 1–50 ("Holista") for Holista's alleged breach of four separate distribution agreements entered into by the Parties between 2015 and 2018.  (*See generally* Compl. (Dkt. No. 6).)  Holista brings counterclaims against ProImmune for breach of contract and breach of express warranties concerning one such distribution agreement.  (*See generally* Second Am. Answer with Counterclaims ("SAA") (Dkt. No. 26).)  Before the Court are ProImmune's Motion for Summary Judgment ("ProImmune's Motion"), (*see* ProImmune's Not. of Mot. (Dkt. No. 48)), and Holista's Motion for Partial Summary Judgment on Its First and Second Counterclaims ("Holista's Motion"; together, the "Motions"), (*see* Holista's Not. of Mot. (Dkt. No. 44)).  For the foregoing reasons, ProImmune's Motion is granted and Holista's Motion is denied.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Rule 56.1, (*see* Holista's Rule 56.1 Statement ("Holista's 56.1") (Dkt. No. 46); ProImmune's Rule 56.1 Statement ("ProImmune's 56.1") (Dkt. Nos. 56, 57-1); Holista's Rule 56.1 Counter-Statement ("Holista's Counter 56.1") (Dkt. No. 73); ProImmune's Rule 56.1 Counter-Statement ("ProImmune's Counter 56.1") (Dkt. No. 65-1)), and the admissible evidence submitted by the Parties.[1]  The facts as described below are in dispute only to the extent indicated.

---

[1] The Court notes that because of the necessity of filing certain documents under seal to protect ProImmune's trade secrets, many documents have been filed on the docket twice—both unsealed (and redacted) and sealed (and unredacted).  (*See, e.g.*, Dkt. Nos. 56, 57-1.)

ProImmune is a single-member Delaware limited liability company owned and operated by Dr. Albert Crum ("Crum"), which sells Immune Formulation 200®, a dietary supplement (the "Product").  (*See* Decl. of Natraj S. Bhushan in Supp. of Holista's Mot. ("Bhushan Decl.") (Dkt. No. 60-1) Ex. 3 ("Crum Dep."), at 10:3–12:15 (Dkt. No. 60-4).)  Holista is an Australian biotechnology corporation that researches, develops, manufactures, markets, and distributes health and wellness products.  *See* About Us, Holista Colltech, https://www.holistaco.com/about-us.html.  Dato' Dr. Rajen Manicka ("Rajen") is Holista's Chief Executive Officer.  (*See* Decl. of Dr. Rajen Manicka in Supp. of Holista's Mot. ("Rajen Decl.") ¶ 1 (Dkt. Nos. 47, 61).)

1. First Contract

On March 16, 2015, ProImmune and Holista entered into their first distribution agreement (the "First Contract"), by which ProImmune appointed Holista to be its exclusive distributor of the Product within a territory encompassing Malaysia, Singapore, Brunei, Thailand, Indonesia, and the Philippines (the "Territory").  (*See* Decl. of Albert Crum M.D. in Supp. of ProImmune's Mot. ("Crum Decl.") (Dkt. Nos. 50–52, 57-3–57-5) Ex. A ("First Contract"), at IV & Schedule 1; *see also* ProImmune's 56.1 ¶ 1; Holista's Counter 56.1 ¶ 1.)[2] Under the terms of the First Contract, Holista was obligated to comply with certain "Minimum Monthly Performance Requirements," defined as "the minimum monthly performance targets required to be satisfied by HOLISTA as specified in Schedule 3" of the First Contract. (ProImmune's 56.1 ¶ 2; Holista's Counter 56.1 ¶ 2.)  Specifically, Holista agreed "to purchase from PROIMMUNE, for distribution within the Territory, not less than the minimum quantities of Product [r]equired in order to meet the Minimum Monthly Performance Requirements" during

---

[2] The Crum Declaration and exhibits thereto were filed across three docket entries.  When referring to the exhibits to the Crum Declaration, the Court refers to the exhibits' native lettering and internal numbering or pagination, as appropriate.

the term of the First Contract.  (ProImmune's 56.1 ¶ 4; Holista's Counter 56.1 ¶ 4.)  Holista's

total Minimum Monthly Performance Requirements under the First Contract were 10,200

kilograms, priced pursuant to a scale set out in Schedule 1 of the First Contract: $40.50 per

pound for the first 10,000 kilograms, $54.00 per pound for the next 1,000 kilograms, $47.25 per

pound for the next 5,000 kilograms, and $40.50 per pound for the next 10,000 kilograms.

(ProImmune's 56.1 ¶¶ 5–6; Holista's Counter 56.1 ¶¶ 5–6.)

The First Contract included a series of other additional terms, including terms governing

inspection and acceptance of the Product.  (*See* First Contract §§ 4.1–4.3.)  Specifically, the First

Contract provided: "HOLISTA shall have the Product[]inspected within seven (7) calendar days

from the Pick-[U]p date [at] the Pick-Up Address to ensure the Product meets the Acceptance

Requirements.  Any Product that does not comply with the Acceptance Requirements may be

rejected by HOLISTA, in which case PROIMMUNE shall at its own cost and expense collect the

Product so rejected at the Pick-Up Address.  Any order not specifically rejected by HOLISTA or

it[s] designee at the Pick-Up address shall be deemed accepted by HOLISTA a[t] the end of such

seven (7) calendar day period."  (*Id.* § 4.1.)  The First Contract also provided that "[r]isk in the

Product shall pass to HOLISTA on acceptance of the Product at the Pick-Up Address by

HOLISTA."  (*Id.* § 4.2.)

The First Contract also provided for warranties.  (*See* First Contract §§ 9.1–9.4.)

ProImmune and Holista each warranted that it was a duly organized corporation or limited

liability company and that it was able to lawfully enter into the First Contract.  (*See id.* § 9.2.)

ProImmune then provided for certain additional warranties as to the Product, including that the

Product: (1) "is not subject to any security interest, liens[,] or other encumbrances"; (2) "is of

satisfactory quality, free of residuals and contaminants, and fit in all respects [f]or the

purposes(s) for which the Product is intended to be used and shall comply with all and any specifications provided by PROIMMUNE for such Product"; and (3) "conforms to the ingredient[s] of such Product as described on the label, package inserts[,] and packaging." (*Id.* § 9.1.1.)

   With respect to termination, the First Contract provided that "[e]ither party may without prejudice to any other rights in this Agreement terminate the Agreement upon thirty (30) days' written notice to the other party under the following circumstances: [(1)] in the event HOLISTA does not achieve the requisite Minimum Monthly Performance Requirement during the Term of this Agreement; or [(2)] in the event PROIMMUNE fails to deliver the Product as purchased by HOLISTA." (*Id.* § 13.3.)  Further, the First Contract provided that "either Party shall be entitled forthwith to terminate this Agreement with immediate effect by written notice to the other Party if . . . such other Party commits a material breach of any of the provisions of this Agreement and, in the case of a breach capable of remedy, fails to remedy the same within thirty (30) calendar days after receipt of a written notice from the terminating party giving full particulars of the breach and requiring it to be remedied." (*Id.* § 13.4.1.)  Lastly, the First Contract provided: "Notwithstanding any other remedies and rights which may be available at law or in equity, the specific remedies set out in this Agreement in respect of any breach or default by either Party of any of the provisions of this Agreement or the termination of the Term are exclusive of all other remedies and rights available in respect thereof and save as provided herein to the contrary, neither Party shall have any claim against the other Party for any loss of profit, revenue[,] or consequential loss suffered or incurred by the first mentioned Party." (*Id.* § 13.6.)

   Finally, as relevant to the instant Motions, the First Contract provided that "[n]o modification or variation of this Agreement shall be valid unless it is in writing signed by [a]

duly authorized representative of the parties and subject to any such modification and/or variation NOT being detrimental to the specified quality of the Product." (*Id.* § 20.1.)

While ProImmune performed all of its obligations under the First Contract, Holista only purchased 6,400 kilograms of Product under the First Contract for a total price of $570,240 and, therefore, did not meet its Minimum Monthly Performance Requirements. (ProImmune's 56.1 ¶¶ 7–8; Holista's Counter 56.1 ¶¶ 7–8.) Throughout the term of and following the term of the First Contract, ProImmune repeatedly reminded Holista of its obligation to meet its Minimum Monthly Performance Requirements under the First Contract, but Holista failed to do so. (ProImmune's 56.1 ¶ 42; *see also* Crum Decl. Ex. E.) For instance, on September 30, 2015, Crum sent Rajen an email in which Crum reminded Rajen that the First Contract "contains a Minimum Monthly Performance Requirements Chart" and that "there should have [b]een 5,000 kg purchased in Malaysia alone by the end of August," but only "approximately 3,000 kg ha[d] been purchased." (Crum Decl. Ex. E at PROIMMUNE_003913–14.)

ProImmune claims that it expected a profit of $▮▮▮ per kilogram from the sale of the first 10,000 kilograms of Product under the First Contract and expected a profit of $▮▮▮ for the next 200 kilograms required to be purchased under the terms of the First Contract. (ProImmune's 56.1 ¶ 9.) As such, ProImmune claims that had Holista complied with the terms of the First Contract and met its Minimum Monthly Performance Requirements, it would have profited $▮▮▮▮. (*Id.* ¶ 10.) Holista disputes ProImmune's entitlement to lost profits, claiming that profits are not recoverable under the terms of the First Contract. (Holista's Counter 56.1 ¶¶ 9–10.)

### 2.  Second Contract

Despite Holista's non-compliance with the First Contract, on June 2, 2016, ProImmune and Holista entered into their second distribution agreement (the "Second Contract"), by which

6

ProImmune again appointed Holista to be its exclusive distributor of the Product within the Territory.  (*See* Crum Decl. Ex. B ("Second Contract"), at III & Schedule 1; *see also* ProImmune's 56.1 ¶ 11; Holista's Counter 56.1 ¶ 11.)  Under the terms of the Second Contract—which mirrored those under the First Contract—Holista was obligated to comply with certain "Minimum Annual Performance Requirements," defined as "the minimum annual performance targets required to be satisfied by Holista as set out more specifically in <u>Schedule 3</u> attached hereto."  (ProImmune's 56.1 ¶ 12; Holista's Counter 56.1 ¶ 12.)  Specifically, Holista agreed to "purchase from ProImmune, for distribution within the Territory, not less than the minimum quantities of Product required in order to meet the Minimum Annual Performance Requirements."  (ProImmune's 56.1 ¶ 13; Holista's Counter 56.1 ¶ 13.)  Holista's total Minimum Annual Performance Requirements under the Second Contract were 12,000 kilograms, at a price of $40.50 per pound for orders of at least 1,000 kilograms.  (ProImmune's 56.1 ¶¶ 14–15; Holista's Counter 56.1 ¶¶ 14–15.)  In entering into the Second Contract, the Parties understood that ProImmune did not intend to waive Holista's compliance with the terms of the First Contract.  (ProImmune's 56.1 ¶ 44; *see also* Crum Dep. 40:20–41:15 (Q. . . . [W]as the decision to move forward on June 2, 2016 with Agreement number 2 because of [Rajen's] promises or something else?  A. As I mentioned, Dr. Rajen's compelling sincerity and his understanding of the science were pivotal decision points.  Q. Were any of those compelling promises that were made to you by Dr. Rajen, did any of them entail repayment of that $453,173.94 that was short under the Agreement number 1?  A. Absolutely.  Q. Do you recall the

sum and substance of that promise that was made to you?  A. That he was going to bring the contract into compliance with future marketing.").)[3]

Like the First Contract, the Second Contract included a series of additional terms, including terms governing inspection and acceptance of the Product.  (*See* Second Contract §§ 4.1–4.3.)  Specifically, the Second Contract provided: "Holista shall inspect all Product within twenty-one (21) days from the Pick-Up Date to ensure the Product meets the Acceptance Requirements.  Any Product that does not comply with the Acceptance Requirements may be rejected by Holista or its customers, in which case ProImmune shall at its own cost and expense collect the Product so rejected at the Pick-Up Address."  (*Id.* § 4.1.)  The Second Contract also provided that "[r]isk in the Product shall pass to Holista on the date on which Holista collects the Product at the Pick-Up Address," but that "[r]isk in the Product shall revert back to ProImmune

---

[3] Holista disputes this fact via a declaration from Rajen, claiming that Crum had "waived any strict compliance with the annual minimums set forth in [the First Contract] and [the Second Contract]" because Holista had raised "a myriad of compliance issues" with the Product Holista did order.  (Decl. of Dr. Rajen Manicka in Opp'n to ProImmune's Mot. ("Opp'n Rajen Decl.") ¶¶ 6, 7 (Dkt. No. 72-4).)  However, the Court finds that Rajen's declaration fails to raise a genuine dispute of fact on this issue because it is directly contradicted by Rajen's sworn deposition testimony.  (*See, e.g.*, Decl. of Ryan Abbott in Supp. of ProImmune's Mot. ("Abbott Decl.") (Dkt. No. 54) Ex. B ("Excerpts of Rajen Dep. I"), at 76:6–19 ("Q. . . . And what about the minimums for the prior contracts when the new contract was signed?  A. Typically it would be very close to completion, like one ton or two ton[s] behind.  Q. And – and it was expected that you would catch that up at some point?  A. Yes.  Q. So Dr. Crum wanted prior contracts to be completed.  They would get kind of near completion.  And anything that was behind there was an expectation you would catch up on as you moved forward?  A. Yes, there was an understanding."), 82:23–83:4 ("Q. And it was never your understanding that Dr. Crum said something like don't worry about past amounts ordered because he was constantly trying to get you to pay for orders to catch up on that, right?  A. Yeah."), 181:19–182:2 ("Q. . . . And we already discussed this, but again it was your kind of understanding at this point you were going to catch up on all these overdue amounts and you never wrote back and said anything like, hold on, these are old agreements, I'm not liable for those minimum amounts anymore, right?  A. No.").)  A party may not "'defeat[] summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony.'"  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (quoting *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013)).

upon dispatch to ProImmune or upon receipt by ProImmune of notice of rejection, whichever is earlier."  (*Id.* § 4.2.)

The Second Contract also provided for similar warranties as under the First Contract. (*See* Second Contract §§ 9.1–9.2.)  ProImmune and Holista each warranted that it was a duly organized corporation or limited liability company and that it was able to lawfully enter into the First Contract.  (*See id.* § 9.2.)  ProImmune then provided for certain additional warranties as to the Product, including that the Product: (1) "is not subject to any security interest, liens[,] or other encumbrances"; (2) "at the time of the Pick-[U]p Date, is of satisfactory quality, free of residuals and contaminants, and fit in all respects [f]or the purpose(s) for which the Product is intended to be used and shall comply with all and any specifications provided by ProImmune for such Product"; and (3) "at the time of the Pick-Up Date, conforms to the ingredient[s] of such Product as described on the label, package inserts[,] and packaging; and is in all respects suitable for distribution and/or retailing to the customer in compliance with applicable laws, regulations[,] and administrative requirements in the United States and Canada." (*Id.* § 9.1.1.)

As to termination, the Second Contract provided that "[i]n the event Holista does not achieve the requisite Minimum Annual Performance Requirement for any year during the Initial Period or any Renewal Term, as the case may be, then ProImmune may, without prejudice to any other rights, terminate this Agreement at any time thereafter upon sixty (60) days' notice to Holista." (*Id.* § 13.3.)   Further, the Second Contract provided that "either Party shall be entitled forthwith to terminate this Agreement with immediate effect by written notice to the other Party if . . . such other Party commits a material breach of any of the provisions of this Agreement, and, in the case of a breach capable of remedy, fails to remedy the same within thirty (30) calendar days after receipt of a written notice from the terminating party giving full particulars of

the breach and requiring it to be remedied." (*Id.* § 13.4.1.) Lastly, the Second Contract provided: "Notwithstanding any other remedies and rights which may be available at law or in equity, the specific remedies set out in this Agreement in respect of any breach or default by either Party of any of the provisions of this Agreement or the termination of the Term are exclusive of all other remedies and rights available in respect thereof and save as provided herein to the contrary, neither Party shall have any claim against the other Party for any loss of profit, revenue[,] or consequential loss suffered or incurred by the first mentioned Party." (*Id.* § 13.6.)

Finally, as relevant to the instant Motions, the Second Contract provided that "[n]o modification or variation to this Agreement shall be valid unless it is in writing signed by [a] duly authorized representative of the parties and subject to any such modification and/or variation not being detrimental to the specified quality of the Product." (*Id.* § 20.1.)

While ProImmune performed all of its obligations under the Second Contract, Holista only purchased 4,000 kilograms of Product under the Second Contract for a total price of $356,400 and therefore did not meet its Minimum Annual Performance Requirements. (ProImmune's 56.1 ¶¶ 16–17; Holista's Counter 56.1 ¶¶ 16–17.) As with the First Contract, ProImmune repeatedly reminded Holista of its obligation to meet its Minimum Annual Performance Requirements under the Second Contract, but Holista failed to do so. (ProImmune's 56.1 ¶ 42; *see also, e.g.*, Crum Decl. Ex. E, at PROIMMUNE_001329 (Mar. 16, 2017 email from ProImmune to Holista: "Presently Holista has two Contractual Agreements that are technically in default that need to be brought back into compliance." (emphasis omitted)).)

ProImmune claims that it expected a profit of $██ per kilogram under the terms of the Second Contract. (ProImmune's 56.1 ¶ 18.) As such, ProImmune claims that had Holista complied with the terms of the Second Contract and met its Minimum Annual Performance

Requirements, it would have profited $███. (*Id.* ¶ 19.) Holista disputes ProImmune's entitlement to lost profits, claiming that profits are not recoverable under the terms of the Second Contract. (Holista's Counter 56.1 ¶¶ 18–19.)

### 3. Fourth Contract

Despite Holista's pattern of non-compliance with the minimum performance requirements of the Parties' distribution agreements, on September 1, 2018, ProImmune and Holista entered into their fourth and final distribution agreement (the "Fourth Contract"), by which ProImmune once again appointed Holista to be its exclusive distributor of the Product within the Territory.[4] (*See* Crum Decl. Ex. C ("Fourth Contract"), at III & Schedule 1; *see also* ProImmune's 56.1 ¶ 20; Holista's Counter 56.1 ¶ 20; Holista's 56.1 ¶ 1; ProImmune's Counter 56.1 ¶ 1.) Under the terms of the Fourth Contract—which mirrored those under the First and Second Contracts—Holista was obligated to comply with certain Minimum Annual Performance Requirements. (ProImmune's 56.1 ¶ 21; Holista's Counter 56.1 ¶ 21.) Specifically, Holista agreed "to purchase from ProImmune, for distribution within the Territory, not less than the minimum quantities of Product required in order to meet the Minimum Annual Performance Requirements." (ProImmune's 56.1 ¶ 24; Holista's Counter 56.1 ¶ 24.) Holista's total Minimum Annual Performance Requirements under the Fourth Contract were 12,000 kilograms, at a price of $40.50 per pound, subject to rebates correlating with various purchase thresholds. (ProImmune's 56.1 ¶¶ 26–27; Holista's Counter 56.1 ¶¶ 26–27.) As with the Second Contract,

---

[4] The Parties' third distribution agreement (the "Third Contract")—the basis for ProImmune's third cause of action, (*see* Compl. ¶¶ 45–49)—is not subject to the instant Motions.

in entering the Fourth Contract, the Parties understood that ProImmune did not intend to waive

Holista's compliance with any previous contracts. (ProImmune's 56.1 ¶ 44.)[5]

Like the First and Second Contracts, the Fourth Contract included a series of additional

terms, including terms governing inspection and acceptance of the Product. (*See* Fourth Contract

§§ 4.1–4.3.) Specifically, the Fourth Contract provided: "Holista shall inspect all Product within

twenty-one (21) days from the Pick-Up Date to ensure the Product meets the Acceptance

Requirements. Any Product that does not comply with the Acceptance Requirements may be

rejected by Holista or its customers, in which case ProImmune shall at its own cost and expense

collect the Product so rejected at the Pick-Up Address." (*Id.* § 4.1.) The Fourth Contract also

provided that "[r]isk in the Product shall pass to Holista on the date on which Holista collects the

Product at the Pick-Up Address," but that "[r]isk in the Product shall revert back to ProImmune

upon dispatch of rejected Product to ProImmune or upon receipt by ProImmune of notice of

rejection, whichever is earlier." (*Id.* § 4.2.)

The Fourth Contract provided for the same warranties as under the Second Contract, (*see*

*id.* §§ 9.1–9.2), and included the same terms as to termination and variation as the Second

---

[5] *See also supra* Note 3; Crum Dep. 81:22–83:7 ("Q. Again, despite the shortfall, as of
the Agreements 1, 2, and 3, you're entering into a fourth agreement with Holista, correct?
A. Yes. Q. And, again, same question as before, is there any particular reason why you're
entering into a fourth Agreement without having received the balance of the previous three
Agreements? A. Well, again, you have to understand the sophistication that Dr. Rajen brought
with his assurances. He understood the unique psychological synthesis of glutathione that this
patent provided. He also understood that a major viral center was doing indispensable antiviral
research. He said he understood the magnificence of this development and he wanted to be a
part of it. Because he backed up his enthusiasm with scientific knowledge, it was very
compelling, it was very sincere. He didn't just talk as a marketer, he talked as a scientist, and as
a pharmacist, also. So, it was not easily dismissed with the backup and, then, he said he was
going to be presenting to a major physician group that was in Asia that would be an assistance
[sic] in marketing. And if we could just hold out and bear with him a little more, he would be
very productive. But he never said he was going to renege on his payments.").

Contract, (*see id.* §§ 13.3, 13.4.1, 13.6, 20.1). As relevant to the instant Motions, the Fourth Contract also provided that "[u]pon the expiry of the Initial Period"—a period of one year— "provided that Holista has complied with all the terms and conditions hereof, and achieved the Minimum Annual Performance Requirements, the terms of this Agreement shall be reviewed by Holista and ProImmune and subsequently when all terms are mutually agreed, including agreement on increased Minimum Annual Performance Requirements . . . and Product Price, this Agreement will be automatically renewed at the end of the Initial Term or any Renewal Term as the case may be, on the same terms and conditions as set forth herein, save and except the Minimum Annual Performance Requirements which shall be increased in accordance with the terms hereof, for . . . successive periods of one (1) year." (*Id.* § 13.2.)

Holista only purchased 3,500 kilograms of Product under the Fourth Contract for a total price of $311,850 and therefore did not meet its Minimum Annual Performance Requirements. (ProImmune's 56.1 ¶ 30; Holista's Counter 56.1 ¶ 30; *see also* Holista's 56.1 ¶ 2; ProImmune's Counter 56.1 ¶ 2.) ProImmune claims that it expected a profit of $▮▮▮ per kilogram under the terms of the Fourth Contract. (ProImmune's 56.1 ¶ 31.) As such, ProImmune claims that had Holista complied with the terms of the Fourth Contract and met its Minimum Annual Performance Requirements, it would have profited $▮▮▮▮. (*Id.* ¶ 32.) Moreover, ProImmune claims that the Fourth Contract was automatically renewed and remains in effect to date. (ProImmune's 56.1 ¶ 35.) However, Holista has failed to make any purchases for 2019, 2020, or 2021 (up to the date of ProImmune's filing). (*Id.* ¶ 39.) As a result, ProImmune claims that had Holista complied with the terms of the Fourth Contract as renewed in 2019, 2020, and 2021, it would have profited $▮▮▮▮, and that these damages are ongoing. (*Id.* ¶ 40.) Holista disputes ProImmune's entitlement to lost profits, claiming that profits are not recoverable under

13

the terms of the Fourth Contract, and claims that Holista's future performance via the contract renewals was excused.  (Holista's Counter 56.1 ¶¶ 32, 33, 35, 40.)

While ProImmune made the 3,500 kilograms of Product that Holista did purchase under the Fourth Contract available for Holista to pick-up, Holista never arranged for pick-up or shipment of the 3,500 kilograms worth of Product.  (ProImmune's 56.1 ¶¶ 47–48.)  Eventually, ProImmune sold the Product to a third party, Three Aminos LLC.  (Holista's 56.1 ¶ 15; ProImmune's Counter 56.1 ¶ 15.)

During the initial term of the Fourth Contract, Holista raised concerns to ProImmune regarding Product it received from ProImmune under the Third Contract.  (*See* ProImmune's 56.1 ¶ 52; ProImmune's Counter 56.1 ¶ 6.)[6]  Specifically, around August 2019, Holista notified ProImmune that one of its customers had tested the Product and allegedly found that the Product's amino acid content was only 50%.  (*See* ProImmune's Counter 56.1 ¶ 19.)  However, that same customer later notified Holista that it had re-tested the same batch of the Product and found that its amino acid content was 88%.  (*See id.* ¶¶ 6, 10, 12, 19.)  Further, ProImmune's manufacturer, UST Sales Corporate ("UST"), had generated a certificate of analysis shortly after

---

[6] Whether the Product about which Holista raised conformity issues was delivered pursuant to the Parties' Third Contract or Fourth Contract is disputed by the Parties: Holista claims that the Product at issue was delivered pursuant to the Fourth Contract and ProImmune claims that the Product at issue was delivered pursuant to the Third Contract.  (*See, e.g.*, ProImmune's 56.1 ¶ 52; Holista's Counter 56.1 ¶ 52.)  However, the Court finds that this is not a genuine dispute because the record evidence clearly demonstrates that the Product at issue was delivered pursuant to the Third Contract.  As explained infra, Holista's concerns regarding the Product at issue stemmed from a test conducted by one of Holista's customers, which allegedly showed that the Product had an amino acid content of only 50%.  In relaying these concerns to ProImmune, Holista identified the batch number of the relevant Product as Lot #1015811.  (*See* Rajen Decl. Ex. C, at PROIMMUNE_003370 (Dkt. No. 47-4).)  Emails between Holista and ProImmune concerning the shipment of Lot #1015811 demonstrate that this batch was included in the POM 18/09 and POM 18/10 Orders, (*see* Crum Decl. Ex. D), and ProImmune's interrogatory responses clearly state that the POM 18/09 and POM 18/10 Orders were produced pursuant to the Third Contract, (*see* Abbott Decl. Ex. C).

the later-contested batch was manufactured, which illustrated that the Product met all of its specifications. (*See id.* ¶ 20; *see also* Decl. of Stephen Chadwick in Supp. of ProImmune's Mot. ("Chadwick Decl.") ¶¶ 1–10 & Ex. A (Dkt. Nos. 53, 57-2).)  And upon receiving Holista's customer's initial complaints, UST also performed stability testing on an earlier batch of the Product—to test for potential degradation of the Product's quality—which demonstrated a high degree of stability at 12 months. (*See* Chadwick Decl. ¶¶ 11–12 & Ex. B.)

B.  Procedural History

ProImmune filed its Complaint on February 13, 2020. (*See* Compl.)  On July 9, 2020, Holista filed its initial Answer, in which it brought three counterclaims. (*See* Answer (Dkt. No. 14).)  On August 13, 2020, Holista filed its First Amended Answer, in which it again brought three counterclaims. (*See* First Am. Answer (Dkt. No. 20).)  On August 21, 2020, ProImmune filed a pre-motion letter in anticipation of moving to dismiss Holista's first amended counterclaims, (*see* Dkt. No. 21), and in response, Holista sought to amend its counterclaims a second time, (*see* Dkt. No. 22).  The Court granted Holista's request, (*see* Dkt. No. 25), and on October 14, 2020, Holista filed its Second Amended Answer, in which it brought two counterclaims, (*see* SAA).  ProImmune filed its Answer to Holista's second amended counterclaims on November 4, 2020. (*See* Dkt. No. 27.)

Thereafter, the Parties commenced discovery. (*See generally* Dkt.)  On April 29, 2021, the Parties jointly requested that the Court enter a briefing schedule for the Parties' anticipated cross-motions for summary judgment. (*See* Dkt. No. 36.)  The Court entered the Parties' proposed briefing schedule on April 30, 2021, (*see* Dkt. No. 37), and later granted two extensions of that briefing schedule, (*see* Dkt. Nos. 39, 41).

On June 14, 2021, Holista filed its Motion, (*see* Holista's Not. of Mot.; Holista's Mem. of Law in Supp. of Holista's Mot. ("Holista's Mem.") (Dkt. No. 45); Holista's 56.1; Rajen Decl.;

15

Bhushan Decl.), and ProImmune filed its Motion, (*see* ProImmune's Not. of Mot.; ProImmune's Mem. of Law in Supp. of ProImmune's Mot. ("ProImmune's Mem.") (Dkt. Nos. 49, 57); ProImmune's 56.1; Crum Decl.; Chadwick Decl.; Abbott Decl.; ProImmune's Request for Judicial Notice (Dkt. No. 55)).  On July 15, 2021, ProImmune filed its Opposition to Holista's Motion.  (*See* ProImmune's Mem. of Law in Opp'n to Holista's Mot. ("ProImmune's Opp'n Mem.") (Dkt. No. 65); ProImmune's Counter 56.1; Decl. of Albert Crum M.D. in Opp'n to Holista's Mot. (Dkt. Nos. 66, 69); Decl. of Stephen G. Chadwick in Opp'n to Holista's Mot. (Dkt. Nos. 67, 68); Decl. of Ryan Abbott in Opp'n to Holista's Mot. ("Opp'n Abbott Decl.") (Dkt. No. 70).)  On July 30, 2021, Holista filed its Opposition to ProImmune's Motion.  (*See* Holista's Mem. of Law in Opp'n to ProImmune's Mot. ("Holista's Opp'n Mem.") (Dkt. No. 72); Holista's Counter 56.1; Decl. of Natraj S. Bhushan in Opp'n to ProImmune's Mot. (Dkt. No. 72-1); Opp'n Rajen Decl.)  On August 6, 2021, Holista filed its Reply in support of Holista's Motion.  (*See* Holista's Reply Mem. of Law in Further Supp. of Holista's Mot. ("Holista's Reply Mem.") (Dkt. No. 74).)  On August 20, 2021, ProImmune filed its Reply in support of ProImmune's Motion.  (*See* ProImmune's Reply Mem. of Law in Further Supp. of ProImmune's Mot. ("ProImmune's Reply Mem.") (Dkt. No. 77); Decl. of Ryan Abbott in Further Supp. of ProImmune's Mot. ("Reply Abbott Decl.") (Dkt. No. 78).)  On August 24, 2021, Holista sought leave to file a sur-reply to ProImmune's Reply, (*see* Dkt. No. 81), which the Court granted, (*see* Dkt. No. 82).  On September 3, 2021, Holista filed its Sur-Reply in further opposition to ProImmune's Motion.  (*See* Holista's Sur-Reply in Opp'n to ProImmune's Mot. ("Holista's Sur-Reply") (Dkt. No. 83).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 355 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

(quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v.*

*Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

### B.  Analysis

ProImmune claims that Holista breached all four of the Parties' distribution agreements by failing to meet the minimum performance requirements. (*See* Compl. ¶¶ 35–54.)  Holista raises eight affirmative defenses, including waiver, and counterclaims that ProImmune breached the Fourth Contract and certain express warranties by delivering non-conforming Product. (*See* SAA 6–7, 11–13.)

In its motion, ProImmune argues that there is no genuine dispute that (1) Holista breached the First, Second, and Fourth Contracts; (2) ProImmune did not waive compliance with the minimum performance requirements of the First, Second, and Fourth Contracts; (3) ProImmune did not breach the Fourth Contract (including because the allegedly non-conforming Product about which Holista complained was both delivered under the Third Contract and, in fact, conforming); and (4) ProImmune did not breach any express warranties provided under the Fourth Contract. (*See* ProImmune's Mem. 4–6, 13–22.)  As a result, ProImmune argues that it is entitled to lost profits under the terms of all three contracts, the last of which remains in effect to date. (*See id.*)

Holista argues in opposition that there are genuine disputes of material fact regarding whether (1) ProImmune waived Holista's compliance with the minimum performance requirements in the First and Second Contracts; (2) ProImmune satisfied the condition precedent of notifying Holista of its breach of the First and Second Contracts; and (3) ProImmune satisfied the condition precedent of itself complying with the Fourth Contract. (*See* Holista's Opp'n

Mem. 6–11.)  Somewhat paradoxically, Holista also argues in its Motion that there is no genuine

dispute of material fact that ProImmune breached the Fourth Contract by delivering non-

conforming Product, which also violated ProImmune's express warranties.  (*See* Holista's Mem.

4–8.)  Holista further argues that, in any event, the terms of all three contracts preclude

ProImmune from seeking an award of lost profits.  (*See* Holista's Opp'n Mem. 11–12.)

### 1.  Merits of Breach of Contract Claims

"To succeed on a claim for breach of contract under New York law, a plaintiff must

demonstrate '(1) the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Roelcke v. Zip Aviation,*

*LLC*, — F. Supp. 3d — , 2021 WL 5491395, at *8 (S.D.N.Y. Nov. 23, 2021) (quoting *Eternity*

*Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004)).[7]  "Because

the plaintiff must prove each of these elements, the absence of a genuine issue of material fact

due to lack of support for any one of them will require an award of summary judgment in favor

of the defendant."  *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88–89 (S.D.N.Y. 1999) (citing

*Celotex*, 477 U.S. at 322–23).  "Where the contract language is wholly unambiguous, summary

judgment is appropriate.  Where the language is ambiguous, however, the contract's meaning

generally becomes an issue of fact, thereby precluding summary judgment.  The key question of

whether the contract language is ambiguous is a question of law to be decided by the

court. . . . Although interpretation of an ambiguous contract is generally a question of fact . . . ,

summary judgment nevertheless may be appropriate where the court is able to resolve the

ambiguity through a legal, rather than factual, construction of the contract terms."  *Sarinsky's*

---

[7] All three contracts at issue are governed by New York law, a fact which neither Party
disputes.  (*See* First Contract § 21.1; Second Contract § 21.1; Fourth Contract § 21.1.)

*Garage Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 485–86 (S.D.N.Y. 2010) (citation omitted);

*see also Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 706 F. Supp. 2d 350,

355 (S.D.N.Y. 2009) ("[I]f the contract is unambiguous, then its construction is a question of

law.").

Generally, the "fundamental, neutral precept of contract interpretation is that agreements

are construed in accord with the parties' intent," and "unambiguous provisions of a[] . . . contract

must be given their plain and ordinary meaning." *Catlin Specialty Ins. Co. v. QA3 Fin. Corp.*, 36

F. Supp. 3d 336, 340 (S.D.N.Y. 2014) (quotation marks omitted), *aff'd*, 629 F. App'x 127 (2d

Cir. 2015). "The language of a contract, however, is not made ambiguous simply because the

parties urge different interpretations. Further, a court must avoid any interpretation that would

be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."

*Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 13-CV-2107, 2014 WL 2510809, at *9

(S.D.N.Y. May 28, 2014) (quotation marks and citations omitted); *see also Metro. Life Ins. Co.

v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise

plain is not ambiguous merely because the parties urge different interpretations in the

litigation.").

### a.  First & Second Contracts

The Court finds that there is no genuine dispute of material fact that Holista breached the

First and Second Contracts by failing to meet its Minimum Annual Performance Requirements.

The Parties agree that: (1) ProImmune and Holista validly entered into the First Contract on

March 16, 2015 and the Second Contract on June 2, 2016; (2) ProImmune complied with all of

its obligations under the First and Second Contracts; (3) Holista failed to meet either its

Minimum Monthly Performance Requirements per the terms of the First Contract or its

Minimum Annual Performance Requirements per the terms of the Second Contract; and (4) as a

result, ProImmune suffered damages. *See supra* I.A.1.–I.A.2.  Holista's only defense is to argue

that ProImmune waived compliance with the minimum performance requirements and that

ProImmune failed to comply with a condition precedent to bringing suit for breach of contract.

(*See* Holista's Opp'n Mem. 7–9.)  Neither is convincing.

First, there is no genuine dispute of material fact that ProImmune did not waive

compliance with the performance requirements.  As ProImmune explains, "[a] waiver is the

intentional relinquishment of a known right with both knowledge of its existence and an

intention to relinquish it."  (ProImmune's Mem. 18 (quoting *Werking v. Amity Estates, Inc.*, 137

N.E.2d 321, 327 (N.Y. 1956)).)  *See also Fundamental Portfolio Advisors, Inc. v. Tocqueville

Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) ("*Portfolio Advisors*") ("Contractual rights

may be waived if they are knowingly, voluntarily[,] and intentionally abandoned." (citing

*Nassau Tr. Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269–70 (N.Y. 1982))).

"However, waiver 'should not be lightly presumed' and must be based on 'a clear manifestation

of intent' to relinquish a contractual protection."  *Portfolio Advisors*, 850 N.E.2d at 658 (quoting

*Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988)); *see also Travelers Cas.

& Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 66 (S.D.N.Y. 2010) ("[F]or the

parties' conduct to amount to a waiver, 'it must not otherwise be compatible with the agreement

as written,' and 'the conduct of the parties must evidence an indisputable mutual departure from

the written agreement.'" (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d

Cir. 2003))); *Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 499 (S.D.N.Y. 2005) ("Such waiver

must be clear, unmistakable, and without ambiguity.").  And, "[t]he burden of proving that a

waiver was knowing and intentional rests with the party attempting to enforce the purported

waiver."  *Wechsler v. Hunt Health Sys., Ltd.*, No. 95-CV-8294, 2003 WL 21878815, at *2

(S.D.N.Y. 2003) (quoting *Sullivan v. Ajax Navigation Corp.*, 881 F. Supp. 906, 910–11

(S.D.N.Y. 1995)); *see also City of New York v. New York*, 357 N.E.2d 988, 995 (N.Y. 1976)

(explaining that "the burden of proving" "a defense of waiver" is on "the party which asserts it").

Holista's waiver argument rests on the notion that by entering into subsequent

agreements with Holista while Holista was in breach of previous contracts' minimum

performance requirements, ProImmune implicitly waived Holista's compliance with those

requirements.  (*See, e.g.*, Holista's Opp'n Mem. 7–8.)  However, it is well settled that "there is

no warrant for the position that a party to a contract waives his rights under the contract by

failing to insist upon performance at the due date and by urging and encouraging the other party

to perform thereafter."  *S.D. Hicks & Son Co. v. J.T. Baker Chem. Co.*, 307 F.2d 750, 752 (2d

Cir. 1962) (citing *Cassidy v. Le Fevre*, 45 N.Y. 562, 562–63 (1871)); *see also Seven-Up Bottling

Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) ("[A] party's

reluctance to terminate a contract upon a breach and its attempts to encourage the breaching

party to adhere to its obligations under the contract do not necessarily constitute a waiver of the

innocent party's rights in the future.").  And far from demonstrating the "intentional

relinquishment" of ProImmune's right to Holista's compliance with the minimum performance

requirements, *Werking*, 137 N.E.2d at 327, the record evidence demonstrates that ProImmune

continuously demanded Holista's compliance with the minimum performance requirements and

entered subsequent contracts with Holista based on assurances from Rajen that Holista would

bring the preceding contracts into compliance.  *See supra* I.A.1.–I.A.2.  Indeed, Rajen confirmed

that he made these assurances during his deposition, (*see, e.g.*, Excerpts of Rajen Dep. I 181:19–

182:2), and on multiple occasions, sardonically referred to Crum's practice of frequently

reminding him that Holista was not in compliance with its contractual obligations as Crum's

23

"favorite hobby," (*id.* at 122:2–9; *see also id.* at 164:24–165:3). Finally, and perhaps most importantly, the sole factual basis for Holista's claim that ProImmune waived compliance with the minimum performance requirements is Rajen's declaration, which the Court has already found is insufficient to create a disputed issue of fact, because Rajen's declaration is directly contradicted by his sworn deposition testimony. *See supra* Note 3. As such, Holista cannot meet its burden of proving a knowing and intentional waiver by ProImmune. *See Wechsler*, 2003 WL 21878815, at *2; *see also City of New York*, 357 N.E.2d at 995 (rejecting claim of waiver, finding "[t]here is nothing more indisputable in this case than that the [plaintiff], far from intending to 'relinquish' its rights, never ceased to press for them").[8]

Second, there is no genuine dispute that the contractual provision that Holista identifies as creating a condition precedent to ProImmune's suit for breach of the First and Second Contracts is inapplicable. A condition precedent "is an event, not certain to occur, which must occur, unless its non-performance is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981). "Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract." 17A Am. Jur. 2d Contracts § 449 (1964). In general, "[a] contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the

---

[8] To the extent Holista attempts to argue that the First and Second Contracts' inclusion of an option for the Parties to renew "provided that HOLISTA has complied with all the terms and conditions" of the First and Second Contracts, (First Contract § 13.2; *see also* Second Contract § 13.2), precluded the Parties from signing entirely new contractual agreements *unless* Holista fully complied with the terms of the preceding arguments—and thus that ProImmune was required to waive Holista's compliance in order to enter into subsequent agreements—this argument is unavailing. Put simply, this interpretation is contrary to the plain language of the contract. *See Homeward Residential*, 2014 WL 2510809, at *9 ("[A] court must avoid any interpretation [of contractual language] that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (quotation marks omitted)).

parties intended to make it a condition." *Id.*; *see also AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 625 (2d Cir. 1996) (same); *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 594 N.E.2d 571, 584 (N.Y. 1992) (same).

Holista argues that the clause in the First and Second Contracts which allowed a Party to terminate the contract in the event that the other Party committed a material breach of the agreement so long as the first Party provided notice and a 30-day period to remedy the breach created a condition precedent to ProImmune's suit for breach of contract that ProImmune failed to satisfy. (*See* Holista's Opp'n Mem. 8–9.) The clause in question states the following: "either Party shall be entitled forthwith to terminate this Agreement with immediate effect by written notice to the other party if . . . such other Party commits a material breach of any of the provisions of this Agreement, and in the case of a breach capable of remedy, fails to remedy the same within thirty (30) calendar days after receipt of a written notice from the terminating party." (First Contract § 13.4.1; Second Contract § 13.4.1.) On its face, this provision applies to *termination* of the First and Second Contracts, not a suit for breach of the First and Second Contracts. As such, this provision clearly does not impose a condition precedent on ProImmune where, as here, ProImmune elects to continue the contract and recover damages for Holista's breach. *See, e.g.*, *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1011 (S.D.N.Y. 1994) ("When a party materially breaches a contract, the non-breaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach." (citing *ARP Films, Inc. v. Marvel Entertainment Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991))), *aff'd* 101 F.3d 108 (2d Cir.

1996); *see also Awards.com LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 156 (App. Div. 2007)

(same), *aff'd*, 14 N.E.2d 926 (N.Y. 2010).[9]

     Accordingly, the Court finds that there is no genuine dispute of material fact that Holista

breached the First and Second Contracts by failing to satisfy the minimum performance

requirements, which ProImmune did not waive.

### b.  Fourth Contract

     The Court finds that there is no genuine dispute of material fact that Holista breached the

Fourth Contract by failing to meet its Minimum Annual Performance Requirements.  The Parties

agree that: (1) ProImmune and Holista validly entered into the Fourth Contract on September 1,

2018; (2) Holista failed to meet its Minimum Annual Performance Requirements per the terms of

the Fourth Contract; and (3) as a result, ProImmune suffered damages.  *See supra* I.A.3.  Holista

does dispute that ProImmune complied with its obligations under the Fourth Contract, arguing

---

     [9] Because the Court has determined that this clause does not impose a condition precedent here, it need not decide whether ProImmune complied with this condition.  However, the Court notes that the record evidence does appear to demonstrate that ProImmune provided ample written notice to Holista of Holista's breaches before bringing suit—both informally, *see supra* I.A.1.–I.A.2., and formally, (*see* Reply Abbott Decl. Ex. A).

     The Court also briefly notes that Holista's objections to ProImmune's submission of its formal notice of breach on reply, (*see* Holista's Sur-Reply 1–2), are meritless.  First, while it is true that generally speaking, "arguments may not be made for the first time in a reply brief," a movant *may* "address[] and respond[] to arguments raised in [the non-movant's] memorandum of law in opposition," *Zirogiannis v. Seterus*, 221 F. Supp. 3d 292, 298–99 (E.D.N.Y. 2016) (citation omitted), which was the function of ProImmune's submission here.  Second, the Court is perplexed by Holista's urging that the Court strike ProImmune's submission for failure to produce the notice during discovery. (*See* Holista's Sur-Reply 1–2.)  Because ProImmune had no obligation to provide pre-suit notice to Holista per the terms of the contract, ProImmune had no duty to include the notice in its initial disclosures, *see* FED. R. CIV. P. 26(a), and Holista has not identified a discovery request to which the notice is responsive, *cf. Kortright Cap. Partners LP v. Investcorp Investment Advisors Ltd.*, 330 F.R.D. 134, 137 (S.D.N.Y. 2019) ("[T]he obligation to produce described or referenced documents will be triggered by either a formal or informal discovery request." (quotation marks omitted)).  As such, it is far from clear that ProImmune had any obligation to produce the notice during discovery.  Moreover, Holista would be hard pressed to demonstrate that it suffered any prejudice when Holista was the recipient of the notice in question.

that ProImmune delivered non-conforming Product which breached the terms of the Fourth

Contract (including the Fourth Contract's warranties), (*see, e.g.*, Holista's Mem. 4–8), but as

explained, *see supra* Note 6, the Court finds that this is not a genuine dispute.

The essence of Holista's Motion and Opposition to ProImmune's Motion as to the Fourth

Contract boils down to a misstatement of the facts.  Holista claims that after entering into the

Fourth Contract, Holista ordered 3,500 kilograms of Product, a portion of which Holista picked

up and delivered to one of Holista's customers, who later tested the Product and allegedly found

it to be non-conforming.  (*See* Holista's 56.1 ¶¶ 2, 5, 6.)  However, the record evidence

demonstrates that the allegedly non-conforming Product was, in fact, delivered pursuant to the

Third Contract.  *See supra* Note 6.  Put simply, Holista cannot succeed on any claim that rests on

ProImmune's breach of a provision of the *Fourth* Contract where the conduct by ProImmune that

Holista argues amounts to breach was under the *Third* Contract.  The Court need not go any

further in ruling for ProImmune on (1) ProImmune's claim that Holista breached the Fourth

Contract, (2) Holista's counterclaim that ProImmune breached the Fourth Contract, and

(3) Holista's counterclaim that ProImmune breached the Fourth Contract's warranties.[10, 11]

## 2.  Damages

"It has long been established in New York that a breaching party is liable for all direct

and proximate damages which result from the breach." *Tractebel Energy Mktg., Inc. v. AEP

Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (citing *Wakeman v. Wheeler & Wilson Mfg.

Co.*, 4 N.E. 264, 266 (1886)); *see also Versatile Housewares & Gardening Sys., Inc. v. Thill*

---

[10] To the extent Holista attempts to argue that ProImmune breached the Fourth Contract because Holista never received the full 3,500 kilograms of Product that Holista ordered under the Fourth Contract, (*see* Holista's Mem. 5), this claim fails.  There is no dispute that ProImmune manufactured the full 3,500 kilograms of Product and delivered it to the location designated as the "Pick-Up Address" under the Fourth Contract.  *See supra* I.A.3.  The terms of the Fourth Contract clearly state that "[t]itle to the Product shall pass from ProImmune to Holista at the point in time that *Holista collects the Product at the Pick-Up Address* and ProImmune receives full payment for the Product." (Fourth Contract § 4.3 (emphasis added).)  As such, while Holista may not have received the full 3,500 kilograms of Product that it ordered, the reason that Holista never received the full quantity was because Holista chose not to pick the Product up at the Pick-Up Address—as Holista appears to admit, (*see, e.g.*, Holista's 56.1 ¶ 7 ("ProImmune acknowledged that Holista paid for $311,650.00 [sic] worth of Product, a large portion of which was *never scheduled for pickup* because there were complaints." (quotation marks omitted)))—not because of any breach by ProImmune.

[11] Even assuming, arguendo, that the allegedly non-conforming Product was delivered pursuant to the Fourth Contract, Holista's claims would fare no better.  First, the record evidence demonstrates that, in fact, the Product at issue was conforming, *see supra* I.A.3.; indeed, Rajen readily admitted during his deposition that Holista's actual complaint with ProImmune was that ProImmune had not gotten in touch with Holista's customer to explain that the Product was conforming and that the customer's initial test had yielded unreliable results, (*see* Opp'n Abbott Decl. Ex. B ("Excerpts of Rajen Dep. II"), at 228:4–9 ("Q. . . . And so, again, from your position this really wasn't an issue except th[at] ProImmune didn't get on the phone and explain to [Holista's customer] why there wasn't a problem and that they had all this verifiable information?  A. Yes.")).  Second, even if the Product had been non-conforming, it is undisputed that Holista failed to comply with the condition precedent of inspecting the Product within 21 days of the Pick-Up Date and rejecting the non-conforming Product.  (*See* Fourth Contract § 4.1.)  ProImmune's contractual warranties extend only to "the time of the Pick-Up date," (*id.* § 9.1.1), and under the terms of the Fourth Contract, "[r]isk in the Product . . . pass[es] to Holista on the date on which Holista collects the Product at the Pick-Up Address" and does not revert back to ProImmune unless and until Holista rejects it, (*id.* § 4.2).

28

*Logistics, Inc.*, 819 F. Supp. 2d 230, 239 (S.D.N.Y. 2011) ("[A] plaintiff in a breach of contract action may recover both general and consequential damages—amounts that compensate the plaintiff both for the value of the promised performance and for additional losses the plaintiff suffered due to the failure to perform." (citing *Schonfeld v. Hilliard*, 218 F.3d 164, 175–76 (2d Cir. 2000))). In other words, an aggrieved party is entitled to "the amount necessary to put [it] in as good a position as it would have been had the contract been fully performed." *McKinley v. Allsopp, Inc. v. Jetborne Int'l, Inc.*, No. 89-CV-1489, 1990 WL 138959, at *8 (S.D.N.Y. Sept. 19, 1990) (citing *Kenford Co. v. County of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986)). "[W]hen the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages." *Tractebel*, 487 F.3d at 109 (citing *Am. List Corp. v. U.S. News & World Rep., Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)). General damages "may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments." *Id.*

Here, ProImmune seeks general damages in the form of the profits it would have made had Holista complied with the minimum performance requirements under the terms of the First, Second, and Fourth Contracts. (*See* ProImmune's Mem. 14, 20–22.) Holista argues that the contracts preclude ProImmune from seeking an award of lost profits, (*see* Holista's Opp'n Mem. 11–12), but this argument is unavailing. Holista argues that "section 14 *et seq.* of each of the Contracts makes clear that the only monies for which Holista would be responsible for [in the event of breach] are unpaid invoices as well as all invoices to be rendered by ProImmune," (*id.* at 11), however, this contractual provision on its face applies only in the event of termination, (*see, e.g.*, First Contract § 14.1.3 ("Upon termination and/or expiration of this Agreement for any

29

reason . . . the Payment Terms shall continue to apply to all outstanding unpaid invoices rendered by PROIMMUNE in respect of the Product AND all unpaid invoices to be rendered by PROIMMUNE in respect of the Product ordered prior to termination but for which PROIMMUNE had not rendered an invoice.")).  As the Court has explained, *see supra* II.B.1.a., there has been no termination here; rather, ProImmune elected to continue the contract and recover damages for Holista's breach.  As such, this provision is inapplicable.  *See, e.g.*, *Bigda*, 898 F. Supp. at 1011 ("When a party materially breaches a contract, the nonbreaching party must choose between two remedies—he can elect to terminate the contract and recover liquidated damages or he can continue the contract and recover damages solely for the breach. . . . Once a party elects to continue the contract, he can never thereafter elect to terminate the contract based on that breach."); *cf. Rosenbaum v. Atlas & Design Contractors, Inc.*, 887 N.Y.S.2d 93, 93 (App. Div. 2009) ("Having terminated the construction contract pursuant to its at-will termination provision, [the] plaintiff was not entitled to damages for breach.").

Accordingly, all that remains is to determine the amount of general damages to which ProImmune is entitled.  ProImmune represents that had Holista complied with the terms of the First Contract, ProImmune would have profited $███████; had Holista complied with the terms of the Second Contract, ProImmune would have profited $██████; and had Holista complied with the terms of the Fourth Contract, ProImmune would have profited ████████ as of the time of filing.  *See supra* I.A.  However, two issues remain outstanding, which preclude the Court from awarding damages at this time.

First, it is unclear to the Court whether the Fourth Contract remains ongoing.  ProImmune argues that the Fourth Contract has been automatically renewed pursuant to §§ 3.3 and 3.4, which provide that: "Not less than sixty (60) days prior to the expiry of the Initial Term or any

Renewal Term . . . the parties shall mutually agree in writing to and set the Minimum Annual

Performance Requirement[s] to be met by Holista in the ensuing one (1) year," and if the Parties

could not agree on the Minimum Annual Performance Requirements, "the parties agree that the

Minimum Annual Performance Requirements for the ensuing one (1) year period will

automatically be set at the level agreed to in the previous Term, and that in such circumstances

either party may terminate this Agreement upon sixty (60) days written notice to the other party."

(Fourth Contract §§ 3.3–3.4.)  However, on their face, these clauses govern the method by which

the Parties will set the Minimum Annual Performance Requirements in the event of renewal, not

renewal itself.  Instead, it appears to the Court that § 13.2 properly governs renewal, which

states: "Upon the expiry of the Initial Period, *provided that Holista has complied with all the*

*terms and conditions hereof, and achieved the Minimum Annual Performance Requirements*, the

terms of the Agreement shall be reviewed by Holista and ProImmune and *subsequently when all*

*terms are mutually agreed*, including agreement on increased Minimum Annual Performance

Requirements pursuant to Clauses 3.3 and 3.4 and Product Price, this Agreement will be

automatically renewed at the end of the Initial Term or any Renewal Term as the case may be."

(*Id.* § 13.2 (emphases added).)  As such, it appears that the Fourth Contract may only be

automatically renewed in the event that at least two conditions precedent are met: (1) Holista

complies with all of the terms of the Fourth Contract, including the Minimum Annual

Performance Requirements, and (2) the Parties mutual agree on the terms that will govern the

renewed contract.  Because the Court has already found that the first condition precedent has not

been met, it appears that the Fourth Contract was not automatically renewed.

      However, the Court is hesitant to hold that the Fourth Contract was not automatically

renewed and award damages under the initial term only when the Parties have not briefed the

issue.  While Holista has disputed ProImmune's claim that the Fourth Contract is ongoing, Holista argues that Holista's future performance under any renewed contract "was excused due to ProImmune's prior material breach of Contract 4 and/or anticipatory repudiation."  (Holista's Counter 56.1 ¶ 40.)  However, the Court has already determined that ProImmune did not breach the Fourth Contract, nor has Holista offered any evidence to support a claim of anticipatory repudiation.  *See* U.C.C. § 2-610 ("When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . .  suspend his own performance.").  Put simply, neither Party has addressed the operation of § 13.2 on the renewal or non-renewal of the Fourth Contract.

Second, neither Party has addressed the issue of mitigation.  "New York law requires the plaintiff in a breach of contract action to mitigate damages it incurs; failure to do so will result in the defendant not being charged with them." *Versatile Housewares*, 819 F. Supp. 2d at 237. "This duty to mitigate only extends to those damages 'that the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense.'" *Id.* (quoting *U.S. Bank Nat'l Ass'n v. Abies & Hall Builders*, 696 F. Supp. 2d 428, 440–41 (S.D.N.Y. 2010)).  Here, the Parties have not yet comprehensively addressed whether ProImmune was obligated to mitigate damages or, if so, which damages were subject to that duty.  The only mitigation that ProImmune has addressed is its sale of the Product that Holista ordered under the Fourth Contract but did not pick up to a third party.  *See supra* I.A.3.  However, neither ProImmune nor Holista has addressed mitigation concerning the Product that Holista was obligated to order but did not order under the First, Second, and Fourth Contracts (and indeed, ProImmune's success in

selling the Product that Holista failed to pick up to a third party may suggest that mitigation would have been possible).

The Parties need to address the questions of whether the Fourth Contract is ongoing and whether ProImmune was subject to a duty to mitigate.

### III.  Conclusion

For the foregoing reasons, ProImmune's Motion for Summary Judgment is granted and Holista's Motion for Partial Summary Judgment is denied.  The Clerk of Court is respectfully directed to file this Opinion & Order under seal, restricted to ProImmune, Holista, and the Court, and to terminate the pending Motions.  (Dkt. Nos. 44, 48, 57).[12]

ProImmune's submission on the questions the Court identified above is due no later than April 15, 2022.  Holista's response to ProImmune's submission is due no later than May 13, 2022.  ProImmune's reply is due no later than May 27, 2022.

SO ORDERED.

Dated:   March 18, 2022
         White Plains, New York

_____
          KENNETH M. KARAS
        United States District Judge

---

[12] This Opinion & Order has been filed under seal because it discusses information covered by a protective order.  As such, the Parties are to submit joint proposed redactions to the Court by no later than April 1, 2022.

33